(No. 30129.— ▇▇▇▇▇▇▇)

Daniel C. Briney, Appellee, *vs.* Illinois Central Railroad Company, Appellant.

*Opinion filed September 24, 1948—Rehearing denied Nov. 11, 1948.*

Joseph Barbera, (Harry G. Fins, of counsel,) both of Chicago, for appellee.

John W. Freels, and Herbert J. Deany, (Vernon W. Foster, and Charles A. Helsell, of counsel,) all of Chicago, for appellant.

Mr. Justice Simpson delivered the opinion of the court:

This case is here on appeal from the Appellate Court which affirmed a judgment for $35,000 against appellant, Illinois Central Railroad Company, a corporation, in favor of appellee, Daniel C. Briney, a minor, by next friend. The case was tried twice in the circuit court of Cook County. A prior judgment in favor of appellee was reversed and the cause remanded by the Appellate Court. (324 Ill. App. 375.) The injury complained of occurred July 7, 1937, when appellee was eight years and nine months old. As a result of the injury amputation of his left leg a few inches below the hip was required.

Appellant's privately owned elevated right of way extends north and south through a portion of the village of Riverdale, Illinois, a suburb of Chicago, and carries seven sets of track numbered from west to east. The westerly two tracks, 1 and 2, carry suburban trains, tracks 3 and 4 carry passenger trains, and tracks 5 and 6 carry freight trains. Track No. 7 is the most easterly and is known as the interchange track. It carries freight trains made up in the Markham Yard at 157th Street to Indiana Harbor Belt Railroad at about 140th Street and also freight moving in the opposite direction. All streets are dead-end streets on both sides of the right of way between 138th and 144th Streets. Underpasses at 138th Street and 144th Street accommodate both vehicular and pedestrian traffic There is no crossing at grade over the right of way between these streets.

The accident occurred on the right of way at a point about 50 feet north of a signal tower located about where the center of 142nd Street would pass if extended across the right of way. The right of way at this point is

approximately 11 feet above ground level. The elevation two blocks farther north is 23 feet. The interchange track (No. 7) parallels track No. 6 from the Markham Yard three miles south of 142nd Street to a point about where 141st Street would intersect the right of way if extended. At that point track 7 leaves the right of way in an arc to the east coming down to grade where it connects with the track of the Belt railroad which runs east and west parallel with, and immediately south of, 140th Street underneath appellant's tracks, through a subway.

The signal tower has two upright posts, one on the east located between tracks 6 and 7 and one on the west between tracks 1 and 2. There is a crossover connecting tracks 6 and 7 controlled by two switches, one at track 6 and one at track 7. The switch on track 6 is approximately 624 feet north of the signal tower and the one on track 7 is about 824 feet north of the signal tower. The next switch on track 7 controls train movements to and from either the north or south wye and is 954 feet from the signal tower. The next one controls movements to and from the north wye, off of and onto the Belt railroad, and is approximately 1078 feet from the last one above mentioned, or 2032 feet from the signal tower. The crossover switch between tracks 6 and 7 accommodates only trains moving north on track 6 and those moving south on track 7. The crossover switch on track 7 would not be thrown for a northbound train.

July 7, 1937, after having lunch with Russell Reichert aged 11½ years, appellee, with the latter and Bobby and Billy Sutton aged 12 and 14 years, respectively, walked down under the viaduct at 140th Street onto the Belt railroad and shot off some fireworks that appellee had. According to appellee's witnesses they then climbed the east bank of appellant's right of way upon a path near this point and walked south upon the elevated right of way to a point approximately 50 feet north of the signal tower

above mentioned. The distance between tracks 6 and 7 at this point is 16 feet 11 inches and the space between them was level and covered with cinders.

After standing between these tracks for ten or fifteen minutes appellee and his companions saw appellant's train one and one-half miles to the south traveling in their direction on track 7. There was nothing between them and the train to obstruct their view of it and they watched it approaching at about four miles per hour. This train consisted of an engine and caboose with 45 cars between them. The train was being pushed by the engine in a northerly direction with the caboose at its northerly end and the engine at the southerly end. As heretofore stated track 7 was the interchange track between appellant's road and the Indiana Harbor Belt line. This train came along daily and was always pushed north up track 7 and onto the Belt line so that when it was upon the latter it would be headed in the desired direction. Appellee was standing half way between tracks 6 and 7, or 8 feet 5½ inches from track 7, as the train approached and as the caboose at its forward end passed him. The other boys were in like positions. It was about 1:50 P. M. and clear. After the caboose and a few cars passed, Billy Sutton jumped on the train. After a few more cars had passed, Bobby Sutton jumped on. After the caboose and ten or twelve cars passed, the appellee ran with the train a short distance and attempted to jump on but his hands slipped and he fell in such manner that his left leg was run over requiring amputation as aforesaid.

From the time the train left Markham Yard the conductor and flagman were in the caboose with the doors open. The conductor sat in the doorway on the east side near the center where he could give signals which could readily be seen by the engine crew as the train traveled around the curve to the east. From his position he could see the track ahead except that portion to his immediate left which would be obstructed by the caboose. The flag-

man sat about a foot inside the door at the forward end which was the northerly end of the caboose. He could see everything on the right of way ahead of the train. The engineer and firemen were both on the engine at the southerly end of the train and the brakeman was riding on the easterly platform of a tank car about twenty car lengths ahead of the engine. The boys did not see the trainmen nor did the trainmen see the boys.

The complaint as amended alleged in substance that on the day of the accident and for a long time prior thereto children of tender years and others were permitted and invited by the defendant to come upon its tracks to throw switches, particularly on the interchange track (No. 7,) in exchange for gifts such as fusees and fruit, and that by reason of the invitation it became and was customary for children to be upon the right of way for the purpose of throwing switches and that defendant owed a duty to the children to keep a lookout for them, to give them warning and to use ordinary care not to injure them. There was no charge of wilfulness in the complaint. The answer denied these allegations. Motions for directed verdict at the close of plaintiff's evidence and at the close of all the evidence, as well as a motion for judgment notwithstanding the verdict, motion for new trial and motion in arrest of judgment, were made in the court below and overruled.

Appellee's case was tried upon the theory that defendant impliedly invited plaintiff to come upon its right of way and throw switches for its employees in exchange for gifts. Appellee's evidence shows that for a year or two before the accident, the witnesses Russell Reichert and Melvin Wilkins and other boys, sometimes 6 or 8 in number, would occasionally throw switches on track 7 for the trainmen, sometimes three or four times a week in the summer; that these witnesses had thrown switches a day or two before the accident; that appellee had never been on the track or right of way of appellant prior to the day of the acci-

dent and did not regularly play with the boys in whose company he was that day; that in exchange for throwing switches the trainmen would usually give the boys fusees and fruit and never chased them off the tracks; that they would wait for the train to come and some one on the caboose would usually given an arm signal, after which the switch would be thrown, and as the train came along they would jump on the caboose and ride to the next switch and run up ahead and throw that one and so on until they got down to the Indiana Harbor Belt line and that they would stand between tracks 6 and 7 between the signal tower and the first switch north of it on track 6. The evidence further shows that at times other boys would jump on and off of a passing train. Appellant's witnesses denied all evidence tending to establish that appellee was an invitee upon the premises when injured.

The rule is well settled that we will not review the facts as found by the Appellate Court, unless the facts so found, in themselves, show that as a matter of law a wrong conclusion was reached by that court. (*Langston* v. *Chicago and North Western Railway Co.* 398 Ill. 248; *Gnat* v. *Richardson,* 378 Ill. 626; *Goodrich* v. *Sprague,* 376 Ill. 80.) The Appellate Court has found in substance that appellee was an invitee of appellant at the time and place of the accident. We shall consider the facts only to determine if there is any proper evidence or inferences to be drawn therefrom tending to prove that relationship and to show it to be operating at the time of the accident.

An owner of premises owes to an invitee thereon a duty to exercise ordinary care not to injure him, (*Milauskis* v. *Terminal Railroad Association,* 286 Ill. 547,) but to a trespasser the owner owes only the duty not to wilfully and wantonly injure him and to use ordinary care to avoid injury to him after his presence on the premises in a place of danger has been discovered. *Illinois Central Railroad Co.* v. *Eicher,* 202 Ill. 556; *Neice* v. *Chicago and Alton*

*Railroad Co.* 254 Ill. 595, 603; *Bremer* v. *Lake Erie and Western Railroad Co.* 318 Ill. 11.

The evidence considered in its most favorable light to appellee shows that certain boys, not including appellee, had been in the habit of throwing switches for the train crew operating on track 7 whenever they were signalled so to do by someone on the caboose. After throwing the switch they would jump on the caboose, ride to the next one and run up ahead and throw it and so on as above mentioned. There is no evidence that the boys were invited to, or ever did, throw switches promiscuously as their desire or judgment dictated, but switches were thrown only upon signal given for that purpose from the caboose. Certainly the invitation was not to throw switches in the absence of the trainmen's expressed order or desire. There is no evidence or inference to be drawn therefrom that the invitation to throw switches applied unless and until the crew indicated their desire that a switch be thrown. No such indication was given on the day of the accident. The boys' mission, therefore, ended when the caboose passed them with no indication that their services would be called for on that occasion.

There is nothing in the record from which it can properly be inferred that appellee knew of the habits of the other boys as to throwing switches, and if he had no knowledge thereof it cannot be said he was on the premises as a result of an implied invitation. Let us assume, however, that he was there on invitation to throw switches. At the time the caboose passed him he was standing in a safe position more than eight feet from the track. It was then evident that the invitation to throw switches would not apply on that occasion, as no signal was given. He then knew his mission was ended and he was at the time in a place of safety. He could have gone his way without injury. What he did thereafter had no connection with the alleged invitation, and in his effort to climb upon the

train about twelve cars behind the caboose he became a trespasser.

The general rule seems to be that, even though a person is an invitee upon the premises of another, the owner is not liable for negligence where the invitee is using a portion of the premises to which the invitation has not been extended and which the owner would not reasonably expect the invitee to use in connection with the conduct of the business on said premises. (*Mount Greenwood Cemetery Association* v. *Hildebrand,* 126 Ill. App. 399; *Louisville and Nashville Railroad Co.* v. *Webb,* 99 Ky. 332; *Louisville and Nashville Railroad Co.* v. *Steele,* 179 Ky. 605; *Faris* v. *Hoberg,* 134 Ind. 269; *Cowen* v. *Kirby,* 180 Mass. 504.) If a person, although on the premises by invitation, deviates from the accustomed way or goes to a place other than such as is covered by the invitation, the owner's duty of care to him as an invitee ceases forthwith. *Armstrong* v. *Medbury,* 67 Mich. 250; *Bedell* v. *Berkey,* 76 Mich. 435; *Mount Greenwood Cemetery Association* v. *Hildebrand,* 126 Ill. App. 399; *Brett* v. *Century Petroleums, Inc.* 302 Ill. App. 99.

In the *Webb case* it was shown to be the custom for boys of tender years to assist freight crews in unloading freight for permission to ride from the freight depot to the water tank. Young Webb had assisted in unloading freight a number of times but not on the day he was injured. He did, however, arrive at the freight depot before the train left and boarded it for a ride to the tank. After reaching the tank he alighted in safety but as the train pulled out he jumped on it and in alighting was thrown under the wheels and injured. The judgment in favor of Webb was reversed and remanded by the Supreme Court. In citing and commenting upon that case later, the same court, in the *Steele case,* said: "It will further be noticed that at no time did the conductor agree that the boys might ride on the train any farther than the water

tank, and that after the train had started from the water tank after stopping there, Webb was hurt in trying to get off and at a time when neither the conductor nor any of the train crew knew he was on the train. Looking at it in this light, although the company might have been liable if Webb had been hurt between the station and the water tank, on account of the habit of the boys in riding from the station to the water tank, when the train left the tank after stopping there to take water and started on its journey, Webb when hurt was not on the train by the invitation or permission of the conductor, because the permission of the conductor to ride ended when the train reached the water tank; and so when the train started the conductor was under no duty to look after the safety of the boys, as he was not required to anticipate that they would attempt to get on the train after it left the tank. In other words, the decision of this case was put upon the ground that Webb was a trespasser at the time he got hurt, not technically but actually, and hence the company did not owe him any duty except to exercise ordinary care to prevent injury to him after his peril was discovered."

In the case of *Norris* v. *Hugh Nawn Contracting Co.* 206 Mass. 58, 91 N.E. 886, a newsboy selling newspapers to workmen in the quarry was injured and was denied recovery by the Supreme Judicial Court of Massachusetts. In the opinion it was said: "If it could be said that there was an invitation to come and sell a paper to the engineer or to the foreman, this involved going but a few steps along the driveway from the street, and it was not an invitation to pass over the ledge and along the derrick."

In *Ryerson* v. *Bathgate,* 67 N.J.L. 337, 57 L.R.A. 307, the court denied recovery to plaintiff who took her cat, on request, to the proprietors of a meat shop and gave it to them stating it should be put in a closet or else it would run away. One of the proprietors walked to the opposite side of the room, opened a door part way and said, "Put

her in here." Plaintiff, supposing it to be a closet entered the doorway which led to a cellar, fell down stairs and sustained injuries. In denying recovery the court said: "The owner's liability for the condition of the premises is only co-extensive with his invitation. And it is incumbent upon the plaintiff to show, not only that her entry upon the premises was by invitation of the owner, but also that at the time the injury was received she was in that part of the premises into which she was invited to enter, and was using them in a manner authorized by the invitation, whether express or implied."

In *Cowen* v. *Kirby*, 180 Mass. 504, 62 N.E. 968, plaintiff, after putting his team in a stable and receiving a check therefor, returned, and while leaning toward his wagon attempting to put some packages in it, was injured. It was held that, in the absence of a special invitation to do as he did, the owner was not liable.

This list of cases might be extended almost indefinitely, but, as the cases are so numerous, and the general rule so uniformly followed, it would be impractical and impossible to attempt to exhaust the cases, and those cited are selected to show the general rule and some of the various conditions of facts to which it is applicable.

Appellee charged that appellant failed to give him warning. The record conclusively shows that he saw this train a mile and a half away and that he watched it as it slowly approached and as the caboose passed him. He was not struck by the train nor by anything protruding from it. He fell under it while trying to jump on it, twelve cars back of the caboose. In his brief, he says: "We do not, as defendant seems to ask this Court * * * to believe, seek to impose a duty on defendant to discover at its peril the presence of children and have an employee stay with them to prevent them from getting on the train, * * *." The caboose having reached and passed appellee while he was in a safe place, any warning or care after that would

almost require that an employee stay with him to prevent him from getting on the train. Appellant owed him no such duty.

The circuit court took the proper view of the evidence and would have decided the case correctly but for the Appellate Court's opinion in the first appeal which drew improper inferences from the evidence. The circuit court said in part: "I will say this to you gentlemen that if it were not for the opinion of the Appellate Court in this case, which I have read carefully and am thoroughly familiar with, I would not hesitate a minute to enter judgment for defendant notwithstanding the verdict."

There are other points urged for reversal which need no discussion. In our opinion the judgment cannot stand. As the pertinent facts have been established, we see no reason for remanding the case for another trial. The judgments of the circuit and Appellate courts are therefore reversed without remanding.

*Judgments reversed.*