(No. 58624.—

JUDITH COPE, Adm'r, Appellant, v. JOHN DOE
*et al.*, Appellees.

*Opinion filed April 4, 1984.—Rehearing
denied June 29, 1984.*

CLARK, SIMON, and GOLDENHERSH, JJ., dissenting.

Beermann, Swerdlove, Woloshin, Barezky & Berkson, of Chicago (Alvin R. Becker, Sheldon N. Goldberg, Howard A. London and Steven P. Garmisa, of counsel), for appellant.

Gates W. Clancy, of Geneva (James S. Mills, of counsel), for appellees.

JUSTICE MORAN delivered the opinion of the court:

Plaintiff, Judith Cope, administrator of the estate of her son, David Askew, brought a wrongful death action in the circuit court of Kane County. The complaint named several defendants; however, the trial court, by agreement of the parties, dismissed all defendants except Western Land Planning Company and Kenneth Ringbloom. The jury returned a verdict in favor of plaintiff and the trial court entered judgment on the verdict. The appellate court, by order, reversed, holding that defendants were entitled to a judgment *n.o.v.* because they owed no duty to plaintiff's decedent as a matter of law. (113 Ill. App. 3d 1167 (Rule 23 order).) Thereafter, this court allowed plaintiff's petition for leave to appeal. 87 Ill. 2d R. 315.

Because of the results reached, we need only consider plaintiff's contention that the appellate court erred when it ruled defendants owed no duty to plaintiff's decedent as a matter of law.

Defendant Ringbloom, a builder and developer, is president of defendant Western Land Planning Company. Defendants designed and constructed an apartment complex in Kendall County known as Shore Heights Village. According to the testimony of Ringbloom, the land upon which the complex is built is owned by Western Land Planning Company and Ringbloom, as president, has the power of direction and control over the property. A subsidiary of Western Land Planning Company, however,

maintained and managed the complex.

Defendants designed Shore Heights Village so as to attract families with children. It had several amenities, including a children's playground, a dog-run area, a swimming pool, tennis courts, a chip and putt golf course, and a club house with pool tables. Defendants also constructed a retention pond to collect and retain surface water from the complex. The retention pond was approximately 25 yards long by 15 yards wide, and was located 100 yards west of the apartment buildings. The building and zoning administrator for Kendall County, George Bell, testified that, at the time the complex was built, the construction of a retention pond did not require approval by the Kendall County authorities. However, prior to construction, defendants submitted the architectural plat pertaining to the retention pond to the building and zoning board of Kendall County. Bell stated that an engineer determined that the retention pond was properly designed and the board approved the plat.

Ringbloom, called by plaintiff as an adverse witness, testified that the retention pond was constructed primarily for drainage purposes and that it was not described as a recreational facility to prospective tenants. Ringbloom stated that he never saw children playing on the pond but he did see children fishing in it. Ringbloom indicated he had no objection to children fishing there but that the pond was not to be used as a swimming area. Ringbloom, in response to plaintiff's question as to whether the retention pond posed a danger to children, answered, "Well, any body of water is a danger to children." He also stated that no precautions were taken to prevent children from going near the pond "other than the manager [of the complex] to warn the parents to keep their children away from the retention pond."

Plaintiff testified that she and her then-husband Edward Cope went to Shore Heights Village to inquire

about renting an apartment. She stated that the manager, Phillip Paninski, showed them an apartment and also described the facilities available to the tenants. She stated that Paninski called her attention to the retention pond and he claimed "it was a place the children could go and fish, and that sometimes they ice skated there in the winter." Plaintiff told Paninski that she and her family "did some serious fishing" and inquired as to what type of fish could be caught in the pond. Plaintiff related that Paninski told her people did not really catch anything, "just some suckers but the little boys like to go over there." In June of 1976, plaintiff, along with Mr. Cope and David, moved into an apartment at Shore Heights Village. Plaintiff indicated she had to drive past the retention pond to get to her apartment and that she always saw children playing on or near the pond. When the pond was frozen, she frequently saw children chasing their dogs on the ice, ice skating, walking and sliding on the ice, and kicking pieces of wood around on the ice.

Several ex-residents of Shore Heights Village also testified that young children frequently played by the pond during the summer and winter. One ex-resident, James Stolp, testified that, when he rented an apartment at Shore Heights Village, Paninski claimed that the retention pond could be used for fishing. Stolp also stated that, when the pond was frozen, he snowmobiled there. Marvin Placek, another ex-resident, claimed that Paninski told him that the retention pond was used for fishing during the summer and ice skating in the winter. In fact, Placek indicated the manager stated that he even fished at the pond himself.

Paninski testified that he remembered meeting the Copes for the purpose of renting an apartment. Although he could not remember verbatim their conversation, he claimed there was no discussion regarding the retention pond. Paninski also stated that he gave a

standard promotional speech to every prospective tenant and he never represented that the retention pond was used for recreational purposes. Paninski further indicated he had seen children playing at the pond.

On March 5, 1977, David, age seven, and two friends, Scott Hartness and Russell Burkitt, were playing at the Hartnesses' apartment, which was located directly above the Copes' apartment. The three boys then went outside to the front yard of the apartment building for awhile before departing to the club house. After playing pool, the boys went to the retention pond to play. On that day, the part of the pond closest to the apartment buildings was approximately one-third covered with ice. The portion of the pond furthest from the complex was open water which, admittedly, could easily be seen.

The evidence pertaining to the events culminating in David's death is conflicting. Russell testified that when they got to the pond he and Scott walked to the edge of the ice, about one foot from where the water began. He stated that he and Scott kicked three pieces of wood, about two feet long, into the water and watched them float back towards the ice. Russell indicated that David was closer to the bank of the pond, approximately 10 yards away from them. Thereafter, Scott retreated to approximately one foot from the bank. David then walked over to Russell, who was still standing on the ice about one foot from the open water. While Russell and David were standing still, about one and a half feet from each other, the ice gave way and the two fell into the water. He stated that the ice was about two and a half inches thick at the point where it cracked. Russell was able to find a large piece of ice to keep him afloat. He then grabbed David's coat collar, but lost his grip. At this time, Scott ran onto the bank of the pond and yelled for David to swim. While Russell was attempting to climb out of the water, Scott walked onto the ice. When

the two met, they fell through the ice but both managed to pull themselves to safety. David, however, was unable to climb out of the water. Russell then ran to the Hartness apartment to get help.

Scott testified that when they arrived at the pond he remained on land and played while David and Russell went approximately 50 feet out onto the ice. He stated that David and Russell were only about 30 feet from the open water. Scott claimed that David and Russell were kicking a board, a three-foot long two by four, to each other but that they were not kicking it in the direction of the water. Scott also stated that there were no other pieces of wood on the ice. Scott later joined Russell and David on the ice and began sliding with his feet. Scott claimed that at that point, he was approximately 10 feet from the edge of the pond. He stated that, although the three could see the open water, there was no water near them. Scott then indicated that the ice beneath David and Russell cracked and the two fell into the water. Scott saw Russell crawling out of the water and David attempting to swim to safety. Scott then started to go further out onto the ice to help David. When Scott and Russell met, however, they fell through the ice. Both Scott and Russell managed to climb to safety. Thereafter, Scott told Russell to go back to his apartment and get his father, John Hartness. Russell, however, was not familiar with the complex, and proceeded in the wrong direction. When Scott noticed Russell was lost, he ran to his apartment. Scott told his father what had happened, and Mr. Hartness got dressed and went downstairs to the Copes' apartment. He related Scott's story to plaintiff and her husband and they left for the pond in the Copes' jeep. When they got to the pond, Mr. Hartness could not see David. He jumped into the water and moved his hands and feet around to feel for David. He was unable to find David and, when the water level

reached his shoulders, he climbed out of the pond. In the meantime, firemen and police officers arrived at the scene. By that time, however, David had drowned.

The jury returned a verdict in favor of plaintiff in the amount of $150,000 for compensatory damages for the death of her son. The jury also answered special interrogatories, finding plaintiff and the decedent's father, "David Askew, Sr.," not guilty of contributory negligence. The appellate court reversed, holding that the pond was an obvious danger and therefore defendants owed no duty to plaintiff's decedent as a matter of law.

Prior to this court's decision in *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, the "attractive nuisance" doctrine governed the liability of owners or parties in possession or control of premises upon which a trespassing child was injured. Under the doctrine, liability was imposed for injuries to the child caused by a condition which attracted him to defendant's premises. In such cases, the courts employed the fiction that the child was an invitee because the defendant, by maintaining a condition that was attractive, enticed the child to enter the premises. It followed then that there was a duty to take reasonable precautions to protect the child from injuries.

The attractive nuisance doctrine however is no longer the law in Illinois. Recognizing that "irreconcilable conclusions" resulted from applying the doctrine, the court in *Kahn* held that "the only proper basis for decision in such cases dealing with personal injuries to children are the customary rules of ordinary negligence cases." (5 Ill. 2d 614, 624.) The significance of this decision is that it discarded the notion that the dangerous condition had to lure children onto the premises, and it established the rule that foreseeability of harm to the child is the test for liability. Moreover, the common law categories of trespasser, licensee and invitee, as they pertain to an injured child's status, are no longer relevant in determin-

ing liability. 5 Ill. 2d 614, 625.

The court in *Corcoran v. Village of Libertyville* (1978), 73 Ill. 2d 316, 326, reiterated the rule announced in *Kahn*. It stated that the customary principles of ordinary negligence must be applied to determine the liability of owners or parties in possession or control of premises upon which a child is injured. The court also stated that a duty which would not be imposed under ordinary negligence will be imposed where an owner or party in possession or control of premises "knows or should know that children frequent the premises *and* if the cause of the child's injury was a *dangerous* condition on the premises." (73 Ill. 2d 316, 326.) It reasoned that "[i]f both these prerequisites are met, it is deemed that harm to children is sufficiently foreseeable for the law to impel an owner or occupier of land to remedy the condition." (73 Ill. 2d 316, 326.) The court in *Corcoran* defined a dangerous condition as one which is likely to cause injury to children generally who, by reason of their age and immaturity, would not be expected to comprehend and avoid the attendant risks. In such an instance, there is a duty to remedy the condition.

This rule however does not impose a *per se* duty upon owners or parties in possession and control of premises to remedy all conditions on their land. It is well settled that if the condition complained of presents *obvious* risks which children would be expected to appreciate and avoid, there is no duty to remedy that condition. The rationale for this rule is that, since children are expected to avoid dangers which are obvious, there is no reasonably foreseeable risk of harm. The law then is that foreseeability of harm to the child is the test for assessing liability; but there can be no recovery for injuries caused by a danger found to be obvious.

This court has acknowledged that "[t]here are many dangers, such as those of fire and *water*, or of falling

from a height, which under ordinary conditions may reasonably be expected to be fully understood and appreciated by any child of an age to be allowed at large." (Emphasis added.) (Restatement (Second) of Torts sec. 339, comment *j*, at 203 (1965) cited with approval in *Corcoran v. Village of Libertyville* (1978), 73 Ill. 2d 316, 327.) In addition, although the attractive nuisance doctrine has been abolished in Illinois, cases decided under that doctrine hold that the dangers of water are obvious and therefore could not, in themselves, be the attraction sought to impose liability. Rather, other objects must have been present which lured children on the land. See, *e.g., Heimann v. Kinnare* (1901), 190 Ill. 156 (no liability for drowning of a 13-year-old boy in a partially frozen clay hole because it was an obvious danger and therefore not an attractive nuisance); *Wood v. Consumers Co.* (1948), 334 Ill. App. 530 (no liability for drowning of a seven-year-old boy in a partially frozen pond because it presented obvious risks and was therefore not an attractive nuisance). Compare *Gustafson v. Consumers Sales Agency, Inc.* (1953), 414 Ill. 235 (where liability was imposed when a child drowned in a pond where sticks, logs, and a five-gallon drum were afloat and frozen in the pond); *City of Pekin v. McMahon* (1895), 154 Ill. 141 (where liability was imposed for the drowning of a child in a partially enclosed, water-filled excavation pit wherein large timbers were floating).

Plaintiff here does not assert that defendants' retention pond posed an extraordinary risk of harm. Instead, she seeks to distinguish *Kahn* and *Corcoran* from the instant case. Plaintiff argues that defendants, as commercial landowners, owed a duty to take reasonable precautions for the safety of those patrons who were invited to use water on their land for recreational purposes. Plaintiff urges that this case is analogous to those where liability was imposed on an operator of a public bathing fa-

cility for the drowning of a child. (See *McClure v. Suter* (1978), 63 Ill. App. 3d 378; *Brumm v. Goodall* (1958), 16 Ill. App. 2d 212; *Decatur Amusement Park Co. v. Porter* (1907), 137 Ill. App. 448.) She posits that "the retention pond, like the swimming pools in the bathing resort cases, was made available to paying customers (tenants) for recreational purposes."

Plaintiff's attempt to establish a duty on the part of defendants by likening decedent's status to that of a business invitee is unpersuasive. As earlier noted, the common law labels of trespasser, licensee, and invitee, as they relate to an injured child's status, are no longer relevant in assessing liability. It is therefore not significant if defendants had invited tenants to use the retention pond for fishing and ice skating. In addition, we find the public-bathing-facility cases cited by plaintiff inapplicable to the instant case. Our courts and the legislature have traditionally regarded public swimming pools differently from other bodies of water. (See Ill. Rev. Stat. 1981, ch. 111½, par. 1201 *et seq.*) The law in Illinois does place a duty upon private operators of public swimming pools or public bathing resorts to take precautions for the safety of their patrons. As expressed by the court in *Decatur*, it is inevitable that injuries will occur at public bathing facilities, and the law imposes a duty to guard against the character of accidents which "common knowledge and experience teach are liable to befall those engaging in the sport which [defendant] had invited the public to participate in." (*Decatur Amusement Park Co. v. Porter* (1907), 137 Ill. App. 448, 452.) Such is not the case with a retention pond. Unlike a swimming pool, a retention pond is not used exclusively for recreational purposes. Although there may be collateral uses for a retention pond, its primary function is to collect and retain surface water to prevent flooding. Moreover, decedent's death was not the result of an accident occurring at the swim-

ming pool defendants maintained at the complex.

Defendants' liability, if any, must therefore be determined by applying the customary rules of ordinary negligence as set forth by *Kahn* and *Corcoran*. The evidence is uncontroverted that the pond was only partially covered with ice and that a large portion of it was open water. Although the testimony was conflicting as to where David was standing on the ice, both Scott and Russell testified that the open water was clearly visible. There was also evidence that the boys were near the edge of the ice and were kicking boards into the water. Under these circumstances, we find that plaintiff has failed to establish that the retention pond was a dangerous condition as defined by this court. The pond was an ordinary body of water which, as any other, presented the risk of drowning. We cannot say that it presented perils that were not appreciated by plaintiff's decedent. Accordingly, we hold that the defendants owed no duty to plaintiff's decedent as a matter of law.

The judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE CLARK, dissenting:

In the instant case, a jury returned a verdict in favor of the plaintiff and the trial court entered judgment on that verdict. The appellate court then reversed the judgment of the circuit court and held that defendants were entitled to a judgment *n.o.v.* because the defendants owed no duty to plaintiff's decedent as a matter of law. The majority has affirmed the judgment of the appellate court. I cannot agree with the majority of this court that the defendants in the case at bar owed no duty to plaintiff's decedent *as a matter of law*. I believe that the questions of whether the retention pond was characterized by the developer as a "recreational facility," whether the retention pond was an "ordinary body of

water," whether plaintiff's decedent appreciated the perils the water presented, and whether the retention pond created a reasonably foreseeable risk of harm (the test for assessing liability), were all matters for determination by the jury.

In *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, the appellate court reversed the judgment of the superior court of Cook County and remanded the cause with directions to enter judgment for the defendants because it held that as a matter of law the supplier of the lumber (upon which the plaintiff fell) was not guilty of any negligence, since there was no duty owed by the supplier. (5 Ill. 2d 614, 619-20.) In that case, this court held that "the questions whether the lumber was so piled as to create an unreasonable danger to children playing thereon, and whether it was so attractive to children as to suggest the probability that children would climb onto it, were questions for the jury under the circumstances shown in the record." 5 Ill. 2d 614, 621.

In *Kahn*, this court stated:

> "*The creator of certain conditions dangerous and hazardous to children because of their immature appreciation of such dangers and hazards must be held to a certain standard of conduct for the protection of such children in accordance with the attendant circumstances and conditions. Account must be taken of the cost and burden of taking precautionary measures and of the right of families and society to rear and develop children with freedom of activity in their communities, without being subject to unreasonable risks which might cause serious injury or death to such children. *** The test in the case at bar is whether the lumber company in the exercise of ordinary care could reasonably have anticipated the likelihood that children would climb onto the lumber and would be injured if it were not securely piled.*

We think the jury was justified in finding, from the condition of the lumber pile, its proximity to the intersec-

tion of two public alleys, the fact that it was delivered during summer vacation in a populous community, and other facts and circumstances in evidence, that defendant should have known it would be likely to attract children who might be injured if they climbed upon the lumber as it was piled. A verdict will not be set aside merely because the jury could have found differently or because judges feel that other conclusions would be more reasonable. (*Lindroth v. Walgreen Co.* 407 Ill. 121.) In the trial of a law suit, questions of one's due care, another party's alleged negligence and the proximate cause of such injured party's injuries and damages are pre-eminently questions of fact for a jury's determination. Under our system of jurisprudence, jury determinations can be set aside only when a court of review, or a trial court upon proper motion, is clearly satisfied that they were occasioned by passion or prejudice or found to be wholly unwarranted from the manifest weight of the evidence. We think the trial court properly overruled defendant's motion for judgment notwithstanding the verdict, and that the Appellate Court erred in deciding otherwise." (Emphasis added.) (5 Ill. 2d 614, 622-23.)

This court further stated:

"It is generally true, as defendant contends, that an owner or one in possession and control of premises is under no duty to keep them in any particular state or condition to promote the safety of trespassers or others who come upon them without any invitation, either express or implied. (*Briney v. Illinois Central Railroad Co.* 401 Ill. 181; *Darsch v. Brown*, 332 Ill. 592.) It is also established that infants, as a general rule, have no greater rights to go upon the land of others than adults, and that their minority of itself imposes no duty upon the occupier of land to expect them or prepare for their safety. (*Burns v. City of Chicago*, 338 Ill. 89; *McDermott v. Burke*, 256 Ill. 401.) *It is recognized, however, that an exception exists where the owner or person in possession knows, or should know, that young children habitually frequent the vicinity of a defective structure or dangerous agency existing on the land, which is likely to cause injury to them because they,*

*by reason of their immaturity, are incapable of appreciating the risk involved, and where the expense or inconvenience of remedying the condition is slight compared to the risk to the children. In such cases there is a duty upon the owner or other person in possession and control of the premises to exercise due care to remedy the condition or otherwise protect the children from injury resulting from it. (Wagner v. Kepler, 411 Ill. 368.)* The element of attraction is significant only in so far as it indicates that the trespass should be anticipated, *the true basis of liability being the foreseeability of harm to the child.* Whether the lumber pile was sufficiently attractive to entice children into climbing upon it, whether its condition would involve danger from such activity, and whether the contractor should have anticipated the probability of the accident, *were matters for determination by the jury. City of Pekin v. McMahon,* 154 Ill. 141." (Emphasis added.) (5 Ill. 2d 614, 625.)

In *Corcoran v. Village of Libertyville* (1978), 73 Ill. 2d 316, a case on which the majority relies, a two-year-old child fell into a ditch in a park near his home and suffered brain damage. In *Corcoran,* this court determined that "the ditch, as described in the pleadings, posed no reasonably foreseeable risk of harm to children." (73 Ill. 2d 316, 329.) This court also held that "[i]t [was] apparent that, in spite of plaintiffs' attempts to characterize the ditch as one with particularly hazardous attributes, the pleadings, stripped of their conclusional emphasis, allege[d] nothing more than the risk of falling into a ditch, a risk which is incident to any common ditch or obvious depression in the ground and one which children generally would be expected to recognize and appreciate." 73 Ill. 2d 316, 328.

I believe that *Corcoran* and the instant case are clearly distinguishable. In the case at bar, we are not dealing with a ditch which was apparently determined to be a natural condition of the ground, we are dealing with a "retention pond" which the developer constructed to collect and re-

tain surface water from the complex. (102 Ill. 2d at 281.) In *Corcoran*, there was also no evidence in the record to show that the ditch posed a reasonably foreseeable risk of harm to children. In the instant case, there was testimony that children frequented the pond to fish and used it for other recreational purposes; therefore it may have posed a reasonably foreseeable risk of harm to children.

I do not agree that a seven-year-old can appreciate the fact that water that is partially frozen actually creates a *greater* risk of drowning, the fact that if a pond is partially frozen, the water is at a temperature where a person who falls in may suffer from exposure, or the fact that if a person falls through a hole in the ice and goes down into the water, he or she may not come back up directly in line with his or her point of entry, become trapped under the surrounding ice, and be unable to come up for air. It may be apparent that if you step off the edge of a ditch you will fall in the hole. I do not think it is as obvious that if you stand on the frozen edge of a pond you will drown. In any event, I believe these issues were factual determinations to be made by the jury, and therefore I respectfully dissent.

GOLDENHERSH and SIMON, JJ., join in this dissent.

JUSTICE SIMON, also dissenting:

I join in Justice Clark's dissent and add a few observations of my own.

In the last paragraph of its opinion the majority states that it "cannot say that it [the retention pond] presented perils that were not appreciated by the plaintiff's decedent." (102 Ill. 2d at 289.) Here the appellate court ordered the entry of a judgment *n.o.v.*, but the court's conclusion does not satisfy the strict standard for granting a defendant a judgment *n.o.v.* announced in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510. That case directs that a defendant is entitled to a judgment not-

withstanding the verdict when the evidence viewed in its aspects most favorable to the plaintiff so overwhelmingly favors the defendant that no verdict for the plaintiff could ever stand. A judgment *n.o.v.* cannot be entered in Illinois merely because the verdict is against the manifest weight of the evidence. *Oberman v. Dun & Bradstreet, Inc.* (7th Cir. 1974), 507 F.2d 349, 353. I believe that to satisfy the *Pedrick* standard, it is necessary for the majority to be able to say affirmatively either that the retention pond presented no perils or dangers to a seven-year-old boy or that, if it did present such perils or dangers, they were fully appreciated by the plaintiff's decedent. The majority opinion falls far short of a positive conclusion of the type that *Pedrick* requires.

This is understandable in view of the testimony of Kenneth Ringbloom, the defendant's president, in which he stated in effect that the retention pond posed a danger to children because "any body of water is a danger to children." (102 Ill. 2d at 281.) Other testimony which makes a judgment *n.o.v.* inappropriate in this case was that of the plaintiff and her cotenants that the manager of the apartment complex, Phillip Paniuski, had told them that the retention pond was a place for children who lived in the apartment complex to fish and to use for ice skating in the winter. In addition, I invite attention to the plaintiff's testimony that, when the pond was frozen, she frequently saw children ice skating there, walking and sliding on the ice, and kicking pieces of wood around the ice. With that testimony, which for purposes of a judgment *n.o.v.* we must assume was true, I believe there was sufficient evidence for the jury to conclude that the defendants were negligent, for they knew the pond was a danger and that children who lived in the apartments were using the ice when the pond was frozen and yet did nothing to prevent them from using it or to warn them of the danger in using it. These children were in no sense trespassers and as residents

could reasonably have been expected to use the pond. On the basis of the evidence taken in its aspect most favorable to the plaintiff, the jury could have concluded that the defendants encouraged children who occupied the apartment complex to use the pond in the winter time without making any effort to warn them of the perils such use presented or to curtail the use.

JUSTICE CLARK joins in this dissent.