Kenneth CORSON, a minor, by his mother and next friend, Lynda LONTZ, and Lynda Lontz, individually, Plaintiffs,

v.

Bruno KOSINSKI and Carolyn Kosinski, Defendants.

No. 89 C 9597.

United States District Court, N.D. Illinois, E.D.

Aug. 18, 1992.

John C. Mullen, Mary Minella, Mullen & Minella, Chicago, Ill., for plaintiffs.

Shelmerdane A. Miller, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Lynda Lontz ("Lontz") brings this action on behalf of herself and her minor child Kenneth Corson ("Corson") against Bruno ("Bruno") and Carolyn ("Carolyn")[1] Kosinski (collectively "Kosinskis"), seeking damages for injuries that Corson sustained when he fell from the roof of Kosinskis' apartment building. Kosinskis now move for summary judgment under Fed.R.Civ.P. ("Rule") 56.[2] For the reasons stated in this memorandum opinion and order, Kosinskis' motion is granted and this action is dismissed.

### Facts

Corson, who lives with Lontz in Austin, Texas, spends each summer with his father and stepmother in Chicago (Corson Dep. 7). On the evening of July 17, 1989 Corson (then 10 years old) fell from the roof of Kosinskis' three-story apartment building located just down the block from his father's home on West Iowa Street.

Access to the roof had to be gained through a back stairwell. Although the ground-level door to that stairwell was locked, each tenant kept a key to the door—it also provided ready access to the basement, which contained laundry facilities, fuse boxes and storage space. Evelyn Benitez ("Benitez"), who was about 11 years old in July 1989, was a tenant in Kosinskis' building and had on a few occasions used her parents' back stairwell key

to let her friends in so they could go down to drink water in the basement or could go to the back porch of her parents' apartment. Because Benitez' apartment opened onto the back stairwell, she could also let her friends in by going through her apartment and opening the stairwell door from the inside (Corson Dep. 18–19; Benitez Dep. 7, 9, 11–12, 29–30, 34).

On the morning of July 17 Benitez and Corson, along with Corson's 8–year–old brother David Corson and one other friend, were playing on the back stairwell after Benitez had opened the back door with her key. After spending some time in the stairwell, the children climbed to the top of the stairs and noticed a door to the roof that had been left slightly ajar (Corson Dep. 15, 21–25). That door was generally locked with a padlock to which only the building's maintenance people had keys, but the padlock was not in place on July 17 (Bruno Dep. 21–23; Corson Dep. 16; Benitez Dep. 14–15). Although none of the children had ever been on the roof before that day, they opened the door and all went out onto the roof (Corson Dep. 27–28; Benitez Dep. 31).

Kosinskis' building, located on the corner of Iowa and Hoyne Streets, consisted of two parts that were connected in the middle. Even though the building had a different address and an entrance on each street, Bruno testified that "[t]he building is all one piece, all one building" (Bruno Dep. 13; see also Carolyn Dep. 7–8). Thus the roof was one continuous surface, which was divided by a north-south firewall that was approximately 2½ feet high and 15 inches wide (Corson Dep. 30–32; Bruno Dep. 15–16).

---

1. Although Carolyn testified (her Dep. 4) that her name is actually "Caroline," this opinion will use Carolyn, consistent with the parties' usage.

2. Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those infer-

ences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991) and cases cited there). This District Court's General Rule 12(m) and 12(n) requires factual statements in support of and in opposition to Rule 56 motions, and both sides have tendered such statements (respectively cited "D. 12(m)—" and "P. 12(n)—") together with their memoranda and supporting materials.

In light of the legal principles over which the parties do battle (discussed later in this opinion), it had to be obvious to both counsel that the physical layout of the roof could well be critical to the decision on the current motion. Yet neither side saw fit to provide this Court with a schematic depiction that would convey a clear understanding of how Corson's fall came about. Finding that the unclear word descriptions [3] and limited photographs that had been tendered by the litigants were inadequate to the purpose, this Court asked for better evidence—and it was then given the report by Lontz' expert "forensic engineer" Irving Hazard ("Hazard"),[4] replete with 53 photographs and three schematics. Exhibit A to this opinion is one of those schematics, showing a plan view of the roof.

In any event, Exhibit A shows the firewall occupying the north 22 feet or so of the two buildings, where they abutted each other directly. During the time that they spent on the roof in the morning, the children began to jump back and forth over the wall, which they could accomplish by taking a short running start (Corson Dep. 32–34).[5]

Later that day the children (now joined by 8–year–old William Szczerba ("Szczerba")) returned to the roof again (the door to the roof was still unlocked) and resumed their wall-jumping game (Corson Dep. 44–48). After some time Corson moved to a different part of the roof—as shown in Exhibit A, its southeastern section (Szczerba Dep. 20, 34; Corson Dep. 51). On the other side of the wall (the west side) at that point was a light shaft that was not visible to Corson when he began his jump from the opposite side (the east side) of the wall.[6] Corson fell down the light shaft after jumping over the wall (Corson Dep. 51, 68).

Until this Court requested and received Exhibit A and Hazard's numerous photographs, the litigants had furnished it with various witnesses' descriptions—which pretty well demonstrated the truth of the saying that a picture (or in this case a schematic drawing) is worth a thousand words. Thus Corson described the shaft this way (Corson Dep. 51):

> The side—I was on the side closest to the door. There's, like, two sides. And I am right near the edge. And I'm running, and I jumped over the wall. And then there was an indention [sic] where the wall came in, and that's where I fell down. And I fell all the way down.

Bruno described the indentation as "a curvature in here that leads the light into the bedroom over here" (Bruno Dep. 13), and Szczerba referred to it as "a little square pit thing going down" (Szczerba Dep. 20). Witnesses who saw the location on the ground where Corson landed said that Corson was "[l]aying on the sidewalk [in a little space] between the two buildings" (B.

---

**3.** Corson described the wall in these terms (Corson Dep. 30–31):
> Q. Was this a wall of the building or what?
> A. It was the wall that was right—that was right in the middle of the building.
> Q. So it was part of the building? Separated the building?
> A. I don't really know. It was—there was a roof, and then there was a wall going right down the middle. And there was just a wall.
> Q. When you say "there was a wall," there was a roof and there was a wall in the middle of the roof?
> A. Yes. It was just, like—it was, like, there was a wall. You could take away the wall and it would just be the same roof. But they put the wall there for some reason. I don't know.

**4.** Hazard does business as Hazard Engineering, Inc. Imagine the scene when he consulted with his college vocational counselor:

> Hazard: What field of engineering do you think I ought to go into?
> Counselor: How about investigating and evaluating accidents?
> Hazard: No way. Just think of all the bad jokes people will come up with.

Nonetheless he has subjected himself to that occupational hazard.

**5.** Corson and Benitez differ as to how long they spent on the roof in the morning. Corson Dep. 38 says that they were there for close to 30 minutes, while Benitez Dep. 31 says that they just briefly looked around and then came back down.

**6.** Exhibit A has been shaded to show the location of the light shaft—the area of discontinuity between the two buildings.

Zuback Dep. 5), "in a light well" (Roche Dep. 19), and "in the—kind of an alcove" (Cimochowski Dep. 9). After examining the building, Hazard gave more details, stating that the light shaft is 30½ inches wide and "the entire light shaft is roughly 18 feet deep and you can see that part of it, the—west portion of it is stepped" (Hazard Dep. 93).

### Kosinskis' Liability

■ *Kahn v. James Burton Co.*, 5 Ill.2d 614, 624, 126 N.E.2d 836, 841–42 (1955) abandoned the attractive nuisance doctrine in Illinois in favor of applying ordinary negligence principles to determine landowners' liability when children are injured on their property. That means a landowner is liable only if he or she has breached a duty owed to the child, and such a duty exists only if harm to the child was foreseeable (*Logan v. Old Enterprise Farms, Ltd.*, 139 Ill.2d 229, 237, 151 Ill. Dec. 323, 327, 564 N.E.2d 778, 782 (1990); *Cope v. Doe*, 102 Ill.2d 278, 286, 80 Ill.Dec. 40, 44, 464 N.E.2d 1023, 1027 (1984)).[7]

■ Although the principles are stated in the same terms, the foreseeability of harm to children is of course somewhat different than it would be for adults. Its determination depends on two factors, both of which must be present to establish foreseeability and a corresponding duty to remedy the dangerous condition (*Cope*, 102 Ill.2d at 286, 80 Ill.Dec. at 44, 464 N.E.2d at 1027, quoting *Corcoran*, 73 Ill.2d at 326, 22 Ill.Dec. at 704, 383 N.E.2d at 180 (emphasis in original)):

1. where the property owner "knows or should know that children frequent the premises *and* "

2. "if the cause of the child's injury was a *dangerous* condition on the premises."

Accord, *Logan*, 139 Ill.2d at 236, 151 Ill. Dec. at 326–27, 564 N.E.2d at 781–82.

### Frequent Presence of Children

■ As to the first of those conditions, Benitez lived in the building[8] and had access to the back stairs through her apartment and through the use of a key. Although the parties dispute the frequency with which Benitez had friends in the building, how often she brought them into the back stairs, and how many children played in the neighborhood,[9] on Kosinskis' motion this Court must credit the testimony ascribing a greater rather than lesser presence of children in or around the building. And even if Bruno was unaware of that as he testified, the reasonable inference from crediting the testimony described in the last sentence is that he *should* have known about it.

But for purposes of this lawsuit the "premises" are neither Kosinskis' building as a whole or even its back staircase. Instead the situs of the allegedly dangerous condition was the building's *roof* (see *Smallwood v. Fornaciari*, 149 Ill.App.3d 79, 102 Ill.Dec. 744, 500 N.E.2d 637 (1st Dist.1986)). Nothing in the record supports either a finding or even a reasonable inference that children frequented *those* "premises"—indeed, the evidence was entirely to the contrary (both the fact that the door to the roof was ordinarily padlocked

---

7. Common law categories of trespasser, licensee and invitee do not apply in defining the duty owed to children (*Cope*, 102 Ill.2d at 288, 80 Ill.Dec. at 45, 464 N.E.2d at 1028; *Corcoran v. Village of Libertyville*, 73 Ill.2d 316, 326, 22 Ill.Dec. 701, 704, 383 N.E.2d 177, 180 (1978)).

8. Bruno was aware of that (Bruno Dep. 11).

9. Lontz, citing the testimony of some tenants and neighborhood children, contends that children commonly played in the area of Kosinskis' building and that Benitez frequently had friends visit in her apartment and occasionally brought them to the back porch and basement (P. 12(n) ¶¶ I.1–I.8). Bruno, on the other hand, testified

that he had never seen children playing in the back area of the building, that by oral agreement tenants' children were not supposed to play on the back stairs and porch and that it was uncommon to see children playing in the neighborhood (Bruno Dep. 10–11, 27–30). It may be noted in that respect (though Lontz's lawyers have not) that in this situation, where Kosinskis were nonresident landlords and had a handyman and one tenant acting as a volunteer "landlady," ordinary principles of respondeat superior would attribute to Kosinskis any knowledge ascribable to their onsite representatives.

and accessible only to the building's maintenance people and the fact that Benitez (as well as the other children) had never been on the roof before).

That poses two somewhat different though related questions:

1. Are Kosinskis insulated from liability here because there is nothing to suggest that any child had previously gone onto the portion of the building where Kosinskis had to know that danger existed? [10]

2. On the evidence presented, can it fairly be said (granting Lontz the benefit of reasonable inferences) that children "frequented" even the back staircase leading to that potential danger area?

Because neither side has really spoken to the first question in those terms, this Court will reverse the order of consideration and begin by addressing the second.

If the term "frequent" is to be given any substantive content as it must, that has to be done in relation to its purpose: the notion of actual or constructive notice to the landlord that access to the zone of hazard would likely be sought on the day that it actually occurred. In that sense Lontz strikes out. Even putting the best face on the evidence she presents:

1. Benitez was the *only* minor who was living in the building (and who thus had access to the locked back staircase at all).

2. During Benitez's 11–year stay in the building, she had taken friends into the back staircase no more than a half dozen times to go to the basement to get drinks of water, and on fewer occasions than that she had taken friends to the back porch area abutting her parents' apartment.

3. *No* one (including Benitez or any of the other children who were deposed) testified that the back staircase itself had *ever* been used as a play area, and no one spoke of *ever* having gone up the flights of stairs leading toward the roof area before the day of the occurrence.

4. Those adults who were deposed (either residing in the building or neighbors) and who spoke of the presence of children testified in a manner directly confirmatory of the children's testimony. To the extent that they spoke of children playing outside of the building, that is of course wholly irrelevant. And the only thing about which one tenant couple testified as their awareness of children's activity within the building was as to sometimes hearing children go through the back door to go out of the building— no tenant or any other adult testified as to even the limited use of the back staircase to which Benitez or her friends testified.

In sum, the evidence is insufficient as a matter of law to establish that children "frequented" the back staircase itself so as to bring knowledge of that home to Kosinskis. That being true, it really becomes irrelevant what precautionary measures the property owner took or might have taken to safeguard against accidents in presumably dangerous precincts.

This conclusion essentially moots the first question. But it may be observed in passing that if the proof had shown otherwise—if it could reasonably have been found that children had frequented the back staircase as a play area, so that Kosinskis would have been on notice of the likely presence of children at the top flight where the staircase opened out to the roof through the door located there, Kosinskis would not have been spared from liability simply because the children had not actually entered the roof area on other occasions. Even if the absence of a padlock on the door leading to the roof were a first-time occurrence (something as to which the record tendered to this Court is silent), and even if Kosinskis knew nothing about it (nothing indicates that they did), it is a fair inference that the failure to have barred access to the roof on the one occasion reflected negligence on the part of the building's maintenance person. And respondeat

**10.** This latter factor, merely assumed for purposes of the current analysis, is dealt with in the next section of this opinion.

superior principles presumably would have placed that negligence on Kosinskis' doorstep.[11]

Because a plaintiff in this type of action must establish two factors to show foreseeability and a property owner's corresponding duty to remedy the presumably dangerous condition, and because Lontz has failed to create a reasonable inference as to the first of those, this opinion might well stop here. In the interest of total analysis, however, it will go on to discuss the second factor as well.

*Dangerous Condition*

Analysis of the second factor—the existence of a dangerous condition that caused the child's injury—is somewhat complicated as well. As for the concept of dangerousness, *Cope* has explained (102 Ill.2d at 286, 80 Ill.Dec. at 44, 464 N.E.2d at 1027; accord, *Logan*, 139 Ill.2d at 235, 151 Ill.Dec. at 326, 564 N.E.2d at 781):

> The court in *Corcoran* defined a dangerous condition as one which is likely to cause injury to children generally who, by reason of their age and immaturity, would not be expected to comprehend and avoid the attendant risks.

■■ In other words, obvious dangers, which even children would be expected to appreciate and avoid, do not give rise to a duty, because the obviousness itself renders it not foreseeable to the owner that the child will expose himself or herself to the danger and therefore suffer harm. As *Corcoran* has taught (73 Ill.2d at 326, 22 Ill.Dec. at 704, 383 N.E.2d at 180; accord, *Logan*, 139 Ill.2d at 235–36, 151 Ill.Dec. at 326, 564 N.E.2d at 781):

> Even if an owner knows that children frequent his premises, he is not required to protect against the ever-present possibility that children will injure themselves on obvious or common conditions.

Among such obvious dangers, *Cope, Corcoran* and *Logan* have all adopted the view of the Restatement (Second) of Torts ("Restatement") § 339 cmt. j (1976) (*Logan*, 139 Ill.2d at 236, 151 Ill.Dec. at 326, 564 N.E.2d at 781, repeating the quotation of the Restatement in *Corcoran*, 73 Ill.2d at 327, 22 Ill.Dec. at 704, 383 N.E.2d at 180 (emphasis in that case); accord, *Cope*, 102 Ill.2d at 286–87, 80 Ill.Dec. at 44, 464 N.E.2d at 1027):

> There are many dangers, such as those of fire and water, or of *falling from a height,* which under ordinary conditions may reasonably be expected to be fully understood and appreciated by any child * * *.

Because the risk of falling from a roof is obvious, then, landowners would not be liable for injuries that result from such a fall as such.

■ In some instances, however, factors may combine to make an otherwise obvious risk nonobvious. As *Scarano v. Town of Ela*, 166 Ill.App.3d 184, 190, 117 Ill.Dec. 72, 76, 520 N.E.2d 62, 66 (2d Dist.1988), again quoting Restatement § 339 cmt. j (emphasis in *Scarano*), has explained, the obvious-risk exculpatory rule is inapplicable in such situations:

> To such conditions the rule stated in this Section ordinarily has no application, *in the absence of some other factor creating a special risk that the child will not avoid the danger,* such as the fact that the condition is so hidden as not to be readily visible, or a distracting influence which makes it likely that the child will not discover or appreciate it.

Similarly, although *Corcoran*, which involved a child falling into a ditch, found that the risk in that instance amounted to nothing more than that of an obvious depression in the ground, the court also ob-

---

**11.** Although to be sure this branch of the discussion must be viewed as dictum, one further qualification should be added. All indications are that the door to the roof area was normally padlocked. That fact would obviously make it less likely that a venturesome child who had previously entered the back staircase for other purposes (Benitez and her friends were the only ones who could fit that description) and who might have wandered upstairs as well—only to find the way barred by a locked door—would have been likely to return. Hence any hypothesizing about the frequency of the presence of children (already held insufficient on the evidence) would be even further attenuated.

served (73 Ill.2d at 328, 22 Ill.Dec. at 705, 383 N.E.2d at 181):

> Under certain circumstances, the condition of a ditch in its surroundings may enhance the risks of injury to unsuspecting children and, in fact, be a danger to children. A ditch may pose such a danger because of its depth or because it is hidden from view or for other reasons.

Applying the same concept, *Smallwood*, 149 Ill.App.3d at 82, 102 Ill.Dec. at 745–46, 500 N.E.2d at 638–39 held as a matter of law that a roof that contained an imperceptible slope and was slippery due to its worn and bubbled gravel and tar surface did not constitute an obvious hazard. And *Pasierb v. Hanover Park Park District*, 103 Ill. App.3d 806, 809–10, 59 Ill.Dec. 461, 463–64, 431 N.E.2d 1218, 1220–21 (1st Dist.1981) held that the combination of a creek frozen over with ice and concealed by a layer of snow created a danger that children could not be expected to appreciate because they could not see it. *Novak v. C.M.S. Builders & Developers*, 83 Ill.App.3d 761, 764, 39 Ill.Dec. 327, 330, 404 N.E.2d 918, 921 (3d Dist.1980) similarly held that an excavation, mounds of dirt and a concrete foundation created a special risk that was greater than that of simply falling into an obvious depression.

■ It is Lontz's burden to establish that the conditions surrounding Corson's fall created a greater than obvious danger (*Corcoran*, 73 Ill.2d at 328, 22 Ill.Dec. at 705, 383 N.E.2d at 181).[12] On that score Lontz argues that the danger in this instance was nonobvious because the light shaft was hidden from view and because the structure of the roof created an illusion that the roof was continuous.

First, she points out, the portion of the wall over which the children had been jumping ran across the middle of the building, with a roof surface on each side. That contributed to Corson's impression, when he approached a different part of the wall for the first time,[13] that the roof would also be continuous at that point (Corson Dep. 67). Another factor supporting that impression is the fact that all outer walls of the building were topped by a perimeter wall except for the edge of the light shaft into which Corson fell. Thus the absence of a perimeter wall there failed to alert Corson that the roof was discontinuous.[14]

---

12. Lontz must also establish that Kosinskis had or should have had a greater knowledge of the danger than did Corson (*Logan*, 139 Ill.2d at 240, 151 Ill.Dec. at 329, 564 N.E.2d at 784; *Swearingen v. Korfist*, 181 Ill.App.3d 357, 363, 130 Ill.Dec. 298, 300–01, 537 N.E.2d 365, 367–68 (2d Dist.1989)). That condition is clearly satisfied: Kosinskis, who had apparently owned the building for more than 15 years (Bruno Dep. 6; Carolyn Dep. 8), were necessarily more familiar with the contours of its roof than Corson was on his first visit. Bruno testified that he goes to the building at least once every week or ten days (Bruno Dep. 30).

13. As indicated earlier, Szczerba Dep. 34 says that Corson fell after he jumped for the first time over the part of the wall that was near the door (and the light shaft). Corson's testimony that he had not seen the alcove before he fell into it (Corson Dep. 68–69) must be accepted for purposes of Kosinskis' summary judgment motion. That is so despite Corson's earlier testimony, which appears to suggest (although it certainly does not clearly establish) that the children had been jumping in the area near the door for some time before Corson fell (*id.* at 48). If that were true, and if Corson had been in a position that made him aware of the light court before he fell, then as a matter of law Kosinskis would not be liable. That conclusion is clear from *Swearingen*, 181 Ill.App.3d at 362, 130 Ill.Dec. at 301, 537 N.E.2d at 368, quoting Restatement § 339, cmt. m:

> [E]ven though the condition is one which the possessor should realize to be such that young children are unlikely to realize the full extent of the danger of meddling with it or encountering it, the possessor is not subject to liability to a child who in fact discovers the condition and appreciates the full risk involved, but none the less [*sic*] chooses to encounter it out of recklessness or bravado.

14. Hazard's affidavit states in part:

> 7. Based on my observation of the scene, the 18-inch parapet or firewall around the perimeter of the roof of the building, was not continuous; the parapet was absent along the west border of the light shaft into which Kenneth Corson fell.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> 13(d) if the parapet had been continuous around the roof at 857–859 Hoyne building, it would have served as a warning to Kenneth Corson, when standing on the east side of the roof looking west, that there was a discontinuity in the roof;
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> 13(i) that the missing parapet on the roof of the 857–859 building creates an illusion on

Finally, the dropoff could not be seen from the opposite side of the dividing wall and was blocked from view by the open roof door as the children entered onto the roof (Corson Dep. 68–69).[15]

Based on those facts, a reasonable jury could conclude that the light shaft posed a hidden danger that would not have been obvious to Corson, so that he could not have been expected to avoid it.[16] Although the existence of a duty is a question of law for the court's decision (*Ross*, 910 F.2d at 1427; *Christon*, 152 Ill.App.3d at 204, 105 Ill.Dec. at 396, 504 N.E.2d at 265), whether a particular set of circumstances constitutes an extraordinary or nonobvious condition may at times constitute a factual issue properly left for jury determination (*Kahn*, 5 Ill.2d at 623, 126 N.E.2d at 841; *Halloran v. Belt Ry. Co.*, 25 Ill.App.2d 114, 120, 166 N.E.2d 98, 101 (1st Dist.1960)).

And so if Lontz had been able to overcome the first of the two hurdles interposed by the Illinois cases as preconditions to recovery in cases such as this, the combination of favorable inferences from the record evidence plus some stretch in the application of the relevant legal principles would have kept her in court. But as said in the preceding section of this opinion, that first-level failure spells defeat for her lawsuit in all events.

### Conclusion

Lontz has not succeeded in raising a material factual question as to *both* of the factors bearing on Kosinskis' liability: (1) whether or not Kosinskis should have known that children frequented the relevant "premises" in their building and (2) whether or not the structure of Kosinskis' roof constituted a hidden, nonobvious danger. There is thus no genuine issue of material fact, and Kosinskis are entitled to a judgment as a matter of law. This action is dismissed.

---

the roof that the roof is continuous, and that children permitted to play on a roof can very easily be deceived into thinking that it is a safe place to play.

**15.** In that respect the Hazard affidavit said:
6. Based on my observations of the scene, when the door of the roof house was opened, between 0 and 90 degrees, the door blocked the view of the light shaft or light well from persons exiting onto the roof.

\* \* \* \* \* \*

13(e) that the maximum distance that Kenneth Corson, a 4′6″ tall male, could stand away from the parapet and still be able to see the edge of the roof surrounding the north portion of the light shaft is 38 inches;
13(f) that if plaintiff was going from east to west, the earliest he would have seen the edge of the roof would have been 38″ away from the edge....

**16.** With all reasonable inferences in Corson's favor, the situation may be contrasted with that in *Ross v. United States*, 910 F.2d 1422, 1427 (7th Cir.1990), which held that a cracked and sloping breakwater did not constitute a hidden danger because "[plaintiff] was certainly aware that Lake Michigan lurked a few feet away at the bottom of the sloping breakwater." On the present motion, it must be assumed that Corson was unaware that a dropoff existed on the other side of the wall when he was jumping. *Christon v. Kankakee Valley Boat Club*, 152 Ill.App.3d 202, 105 Ill.Dec. 394, 504 N.E.2d 263 (3d Dist. 1987), also cited by Kosinskis, is distinguishable in the same way as *Ross*.