**Daniel HALL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 84–2291.**

United States District Court, C.D. Illinois, Danville Division.

Oct. 16, 1986.

Frederick Underhill, Danville, Ill., for plaintiff.

Paul Kanter, Asst. U.S. Atty., Danville, Ill., and Jay Barrymore, Office of Gen. Counsel, U.S. Dept. of Agriculture, Washington, D.C., for defendant.

### FINAL ORDER *

BAKER, Chief Judge.

This is an action for damages under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Jurisdiction is based upon 28 U.S.C. § 1346. At the close of the plaintiff's evidence, the defendant moved for dismissal

---

* This is an edited transcript of the court's orders given extemporaneously at the conclusion of the arguments on the defendant's motion to dismiss.

pursuant to Fed.R.Civ.P. 41(b). For the reasons hereinafter stated, the motion will be allowed.

### I.

The facts of the case are really undisputed. Between April 30 and May 2, 1982, the plaintiff, who was then seventeen and one-half years old, and a senior in high school, went to Southern Illinois with an Explorer scout troop of which he was a member. The Explorers spent the weekend camping and hiking in the Shawnee National Forest and in adjoining state park areas. The injury, which is the subject of the suit, was suffered by the plaintiff on the morning of May 2, 1982, at about 11:30 a.m.

The Shawnee National Forest is 263,000 acres of woodland and bluff country maintained in its natural condition. The terrain as described by Kenneth Konsis, the Explorer troop leader, and as shown in Group Exhibits 1 and 2, is wild. The country consists of sheer rock faces, large trees, heavy undergrowth, standing water, small streams, and is primitive and naturally maintained. There are some improvements or developments in the park. A few campgrounds and sanitary facilities are maintained by the forest service but the area is predominantly open, undeveloped, and left in a natural state. (Group Exhibits 1 and 2 show precisely the nature of the landscape, the steepness of the rock faces, the narrowness of the trails, and the difficult footing to be encountered in the area.)

The troop hiked over the trails in the Shawnee National Forest and on April 30th and May 1st, camped overnight at a nearby state campground. On the morning of May 2, 1982, the troop went to the Bell Smith Springs area in the national forest and, following that, went north to see the area known as Burden Falls where the plaintiff was injured. The troop arrived at Burden Falls about 11:30 in the morning and went down the path that descends next to the falls to the foot of the falls. *See* Joint Exhibit 2A. The path is a "man-worn" path through the woods. The only real estate improvement, if it could be called improvement, made by the forest service at Burden Falls was a graveled area leading from Forest Road 402 onto a bare rock space that had been developed as a turnaround for road grading vehicles. The turnaround area is used by visitors to park their vehicles while they go to view the falls and is made available to visitors by the forest service for the purpose of parking.

The plaintiff, along with the rest of the troop, started to descend the path. Approximately half-way down to the foot of the falls, the troop members came to a point in the path from which they could see the falls. Exhibit 2A shows the falls to be a drop over a sheer rock face of some thirty feet. There are two ledges that traverse the face of the falls. One is about ten feet down the face of the falls. The other is an upper ledge which is really, as near as can be seen in the photographs, the head or lip of the falls.

The plaintiff and two of his companions, a young man named McCorkle and another named Spicer, left the path and started to cross the falls on the first ledge. They turned back after walking almost to where the water came across the lip of the falls. The three descended farther down the path to a point where they could gain access to the lower ledge. They started to walk across the falls on the second ledge. They reached the place where the water was falling down the face of the rock and turned around and went back to the path. The plaintiff and his two companions continued to descend the path to the foot of the falls. Apparently the remainder of the troop, including the troop leader and the assistant leader, had gone directly down the path to the foot of the falls.

At the foot of the falls the troop explored downstream for some thirty yards looking for natural objects of interest, snakes, lizards and so forth. After the troop had been at the foot of the falls for some twenty minutes, the leader announced that it was time for lunch and started back up the path to where the troop's vehicle was parked. The troop climbed the same path

that it used to descend to the foot of the falls.

The plaintiff, as near as may be reasonably inferred from the evidence, did not follow the troop. He crossed the stream to the side opposite from the path and climbed up the side of the falls. There was really not much of a stream at that time of year. The photographs (Group 1 Exhibits) taken by the scout leader show that the amount of water coming across the falls was sparse. The plaintiff, apparently, climbed up the side of the falls to the second ledge, opposite the path that had been used by the scout troop to both descend and ascend. One of the troop members, as he was climbing the path, saw the plaintiff beginning to cross the face of the falls on the second ledge. Other members of the troop reported that while they were climbing the path, they saw, out of the corner of their eyes, an object fall. One of them heard a cry and the sound of something striking the rocks below. One of them heard a voice call out "Danny." No one actually saw the plaintiff fall.

The troop members all report that when they finally did look to their right, they saw that someone had fallen from the face of the falls and was lying on the rocks below. The troop members went to the foot of the falls where they found the plaintiff. He was lying directly in line with the water fall and about a foot downstream. The plaintiff had suffered an injury to his spinal cord at the eighth thoracic level and is now a paraplegic.

## II.

The plaintiff seeks recovery for his injuries on several theories. First, he claims that the defendant was negligent and the defendant's negligence was a proximate cause of the plaintiff's injuries. Alternatively, the plaintiff says the defendant acted in a willful and wanton manner and caused the plaintiff's injuries. Finally, the plaintiff seeks to recover on the basis that the United States was "willful and malicious" as that term is used in the Illinois Recreational Use Statute, Ill.Rev.Stat. ch. 70, Para. 31 *et seq.*

Illinois law controls in this case. 28 U.S.C. § 1346(b). The standard of care in Illinois owed by an owner of land to a person upon that land is well established. If the plaintiff was an invitee, the defendant owed the plaintiff a duty of due care for his safety. If the plaintiff was a licensee or a trespasser, the defendant owed the plaintiff a duty to refrain from willful and wanton misconduct which might injure the plaintiff. *See* Comment IPI 2d 120.02, 120.03. If the operation of Shawnee National Forest is covered under the Illinois Recreational Use Statute, Ill.Rev.Stat. ch. 70, Para. 34, then the defendant would be under a duty to refrain from "willful and malicious" conduct toward the plaintiff.[1]

The dangers shown in Group Exhibit 1 and Group Exhibit 2 are not hidden. They are open and apparent dangers. The area of Shawnee National Forest in which the plaintiff was injured is primitive and natural. Exhibits 1 and 2 show Burden Falls as having sheer rock faces of thirty feet and more, with ledges along the face of the cliff and water running over it. The United States did not develop the Burden Falls area. There are no facilities there for use of visitors—no campsite, no toilet facilities. To the contrary, the owner offered the premises in a natural condition to those who wished to come upon the land. There was no fee charged for admission to the land.

The United States, under these circumstances, should be similar to a private landowner who permitted the Shawnee Nation-

---

1. The United States contends that the plaintiff should be considered an adult at the time of the occurrence. The plaintiff should be held to an adult standard of care. He was seventeen and a half years old, a senior in high school, and by his own statements, a person experienced in the woods and traveling on foot through natural or primitive terrain. The plaintiff's counsel concedes that the plaintiff should be held to an adult standard of care. Because of the disposition of this motion, however, I don't believe that it is necessary for the court to reach a discussion of the care exercised by the plaintiff.

al Forest area to be used by the public and would be subject to the Illinois Recreational Use Act. The United States, then, would have been required to refrain from "willful and malicious" conduct toward the plaintiff. Certainly, there is nothing in the evidence which could support a finding of "willful and malicious" as those words are interpreted in *Davis v. United States,* 716 F.2d 418 (7th Cir.1983). There were no hidden dangers at Burden Falls. There was no history of similar accidents at the falls. The United States did not know the plaintiff likely would be injured and then wickedly fail to warn him of the danger.

Nor can it be said that the United States is guilty of willful and wanton conduct. If the Illinois Licensing Act, Ill.Rev.Stat. ch. 111½, Para. 761, *et seq.,* applied and not the Use Act, and if the plaintiff was a licensee under Illinois law,[2] then the duty upon the defendant was to refrain from willful and wanton conduct. The defendant was "not to engage in a course of action which shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard for a person's safety." IPI2d 14.01; *see also* Restatement (Second) of Torts, § 342 (1965). Had the danger been hidden as it was in *Davis* and *Miller v. United States,* 597 F.2d 614 (7th Cir.1979), then there might have been a duty upon the United States to warn of the danger. But here the danger was open and obvious. It fairly cried out. The extreme risk of falling from the face of this sheer rock cliff, if you attempted to cross it, was something any person of ordinary sensibilities would have recognized. An urban dweller would have recognized it as akin to walking across the face of a building on a wet ledge two floors above the ground level. There was no evidence of intention to injure and since the danger was so obvious, the failure to warn could not constitute an utter disregard or conscious indifference to the plaintiff's safety.

Taking the facts with their intendments most favorable to the plaintiff, however, and assuming, for purposes of this motion, that the plaintiff was an invitee and that the defendant owed the plaintiff a duty of ordinary care, the plaintiff still cannot prevail. The danger of falling when climbing on a sheer rock face like Burden Falls is obvious. Look at Group Exhibits 2A and 2B. There is no testimony or evidence in the record that anyone was injured in a fall from the face of this cliff before the plaintiff fell. Where is there a duty to warn against such an open and obviously perilous condition?

The Illinois law on the question of due care to guard against injuries from an apparent and obvious danger is set out in *Cope v. Doe,* 102 Ill.2d 278, 286, 80 Ill.Dec. 40, 464 N.E.2d 1023 (1984). In that case a child of seven drowned in the defendant's pond. In discussing the question of the duty of the landowner, the court stated, "This court has acknowledged that there are many dangers such as those of fire and water or of falling from a height which under ordinary conditions may reasonably be expected to be fully understood and appreciated by any child of any age to be allowed at large." *Id.* at 286, 80 Ill.Dec. 40, 464 N.E.2d 1023. The court went on to hold that there is no duty of ordinary care to warn or guard against an obvious and apparent danger. Here, the defendant in the exercise of ordinary care would not have been called upon to warn the plaintiff that he might fall from the face of the cliff. It was not necessary to warn the plaintiff that crossing a narrow ledge, with water running over it, twenty feet above the ground, could prove hazardous, if not lethal. The danger would have been apparent to any child old enough, as the Illinois Supreme Court said, to be at large.

It is a fair inference, but I don't know precisely, that the plaintiff saw the rest of the troop going up the path when he was

---

**2.** Conceivably the Licensing Act could apply because the United States maintained a campsite one and one-half miles south of Burden Falls. But the Licensing Act does not establish stan-dards of care, and given the natural environment at Burden Falls, the plaintiff would have been a licensee—a person permitted to use the land for his own purposes.

on the opposite side of the falls. Rather than descend to the foot, go across and catch up with the troop, he took the obviously dangerous shortcut across the face of the falls, lost his footing and fell. This is a tragic occurrence. I have the greatest sympathy for the plaintiff. He has a grievous, permanent injury, but I can't lay the fault for that injury at the feet of the forest service.

The motion of the United States for dismissal under Fed.R.Civ.P. 41(b) is allowed. The Clerk is directed to enter judgment in favor of the United States and against the plaintiff.