MICHELLE STEVENS, a Minor, by John Stevens, her Father and Next Friend, *et al.*, Plaintiffs-Appellants, v. ROBERT RILEY *et al.*, Defendants-Appellees.

Second District   No. 2—90—1438

Opinion filed September 19, 1991.—Rehearing denied November 4, 1991.

Paul B. Episcope, John C. Erb, and Lynne Plum Duffey, all of Paul B. Episcope, Ltd., of Chicago, for appellants.

Jon Yambert, of Lindner, Speers & Reuland, P.C., of Aurora, for appellees.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiffs, Michelle Stevens, a minor, by John Stevens her father and next friend, and John Stevens and Elizabeth Stevens, individually, filed an action against defendants, Robert and Brenda Riley, along with other defendants, alleging that the Rileys' negligent maintenance of their residential property resulted in severe injury to Michelle Stevens when she fell into a body of water located on their property. The trial court granted the Rileys' motion for summary judgment and dismissed all claims against them; the other defendants to the action are not parties to this appeal. Plaintiffs timely appeal, contending that the trial court erred in granting summary judgment. We affirm.

On May 20, 1987, plaintiffs filed suit naming the Rileys as defendants in counts III and IV of the complaint. Those counts were amended several times. Plaintiffs alleged that on May 20, 1985, Michelle was injured when she fell into a man-made retention pond behind defendants' home (this body of water is also referred to as a creek). Michelle, who was then 17½ months old, suffered severe and permanent brain injury.

At the time of the incident, plaintiffs lived in the same subdivision as the Riley defendants. Brenda Riley ran a licensed day-care center

in her home which Michelle Stevens attended Monday through Friday. In addition, the Rileys' 14-year-old daughter, Janet, watched Michelle on Saturdays at the plaintiffs' home. On the day of Michelle's injury, Brenda Riley cared for Michelle in the earlier part of the day, until John Stevens returned from a dentist's appointment and picked up his daughter.

Later that day, at about 7 p.m., John Stevens brought Michelle with him to the Rileys' house for a social visit. Robert Riley was washing his car, and the two men conversed while Michelle played in the driveway by the car. About 10 minutes later, Elizabeth Stevens arrived home from work and crossed the street to join her family in front of the Riley home. Brenda Riley then came out of the house and talked with Elizabeth.

The Rileys' daughter, Janet, arrived home with a friend, Diana, and went in the front door. The Rileys' son, Bob, was already inside the house along with the family dog, Mandy. According to Elizabeth, Michelle followed the girls into the house; however, Brenda claims that she did not see Michelle go into the house and claims that nobody inside the house had seen her either. Plaintiffs contend that John Stevens subsequently asked where Michelle was and, according to Elizabeth, Brenda Riley replied that Michelle was in the house. Brenda claims that it was she who asked where Michelle was and that it was Elizabeth who stated that she went into the house with Janet. Brenda then went into the house and reported that Michelle was not inside.

Everyone began searching for Michelle. Plaintiffs claim that they searched the inside of the house again. John claimed that, while he was in the house, he noticed that the sliding glass doors leading out onto the deck were opened. John went out onto the deck, down the stairs, and into the backyard. Elizabeth stated that she saw John come down the stairs. However, according to Brenda, the sliding glass doors were closed when she checked the house and the deck had no stairs leading to the backyard because it was in the process of being rebuilt.

In any event, both couples then ran to the water behind the house. The water, which was either stagnant or slow moving, ran through the Rileys' backyard and through the yards of their neighbors on both sides. The edge of the water on the Rileys' property was surrounded by at least 10 to 15 feet of thick prairie grass or weeds which, at the time of the incident, stood approximately 18 inches to three feet high. The neighboring property to the east of defendants' also had prairie grass bordering the water; however, the neighbors to

the west had mowed their grass down to the bank and had fenced their property off from defendants' property. The fence was a rail fence with chicken wire on the bottom of it. According to John, a 17-month-old child could not have negotiated her way through the fence. None of the property owners, including defendants, had fenced off the water from their property. It was alleged that the drop-off on defendants' property to the water was steep and sudden.

John claimed that, when he did not find Michelle in the house, he ran straight back from the stairs of the deck to the creek and noticed that some of the weeds were irregular in that there were "places where it looked like somebody could have went [sic] through the weeds." John then spotted Michelle, who was a little to his left and floating facedown in the water. He went into the water to retrieve her as did Elizabeth and Robert. The paramedics were subsequently called.

Brenda stated that after they found Michelle, she noticed that Mandy, the dog, was running around the backyard barking wildly and she was wet. Brenda claimed that Mandy hates water and did not recall Mandy ever going into the creek. However, Robert Riley stated that the dog would go into the creek "a few times off and on." In addition, Elizabeth Stevens testified that, at the hospital, the Rileys' daughter, Janet, told her that before Michelle was found, the dog came in the house through the sliding glass doors, barking, jumped up on the couch and was all wet. It was generally agreed that Mandy played with the children at the day-care center, including Michelle.

The day-care center was licensed by the State of Illinois in January 1984. In May 1985, Michelle was the youngest child at the center. She was 17½ months old, and the other children ranged in ages from 2½ to 5½. According to Brenda Riley, the children in the day-care center did not play outside in May of 1985 because it was too cold. However, the children did play outside during the prior summer, and there was a swing set and sandbox located in the backyard approximately 25 feet to 45 feet from the creek. While the other children were allowed to play on the swing set, Michelle was not allowed to do so because of her age. Therefore, Brenda Riley would play with Michelle in the middle of the yard where she could still see the other children play.

Elizabeth Stevens testified that she occasionally visited Brenda while the day-care was in session. Sometimes she and Brenda would sit inside talking near the sliding glass doors when there were no adults outside with the children. Elizabeth admitted, however, that

from the doors one could easily see the sandbox and the strip of weeds.

Other than when the day-care was in operation, children did not play on the Riley property back by the weeds. According to Brenda Riley, the children in the day-care were instructed not to step into the prairie grass. In addition, she claimed to have spoken with all the parents who enrolled their children in the day-care, warning them about the creek and asking them to talk to their children about it at home. Brenda did not recall any discussions with the plaintiffs about it. However, plaintiffs were made aware of the existence of the creek in the spring of 1981.

In their third amendment to counts III and IV of the complaint, plaintiffs allege that Michelle was lawfully upon the defendants' property on May 20, 1985, as a licensee and with defendants' actual knowledge and consent. Because of the operation of the day-care, it is argued that defendants were aware that children of very tender years frequented the premises, including Michelle. It is further argued that defendants permitted an unnatural accumulation of water to exist on their property which was obscured by weeds and had a sudden drop-off of between three to four feet in depth at its edge. Plaintiffs allege:

> "The aforesaid conditions were likely to cause injury to children of very tender years who were known by the defendants to frequent the premises in close proximity to the water and who, by reason of their immaturity and the three-foot high weeds at the edge of the retention pond obscuring its view, were incapable of appreciating the danger involved, and would be incapable to escape from the said retention pond once having entered it due to the sudden drop-off."

Plaintiffs allege that defendants failed to exercise ordinary care for the safety of Michelle by failing to fence or barricade the water, allowing the sudden drop-off to exist, allowing weeds and brush to obscure the water, and allowing the water to exist on their property. Plaintiffs allege that as a proximate result of defendants' negligence Michelle was injured.

Defendants filed a motion for summary judgment on amended counts III and IV, which was granted by the trial court. The court held that there was no legal duty under the existing facts. The court considered plaintiffs' argument under *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, and determined that the application of the *Kahn* doctrine under these facts would place an onerous burden on any social host in the defendants' position. The trial court's subsequent or-

der included a finding that there was no just reason to delay enforcement or appeal. Plaintiffs timely appeal.

We note at the outset that summary judgment is a drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) The motion should be granted only if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c).) In determining the presence of a genuine issue of material fact, the court must construe the evidence strictly against the movant and liberally in favor of the opponent. *Purtill*, 111 Ill. 2d at 240.

■ Plaintiffs contend that defendants breached a duty owed to plaintiffs on the basis of the rule established by the Illinois Supreme Court in *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614. In *Kahn*, the court held that the possessor of land is liable for injuries sustained by children when the injury is caused by a dangerous condition on the property and the owner knew or should have known that young people habitually frequent the area. The *Kahn* decision and its progeny have created a four-pronged test for the imposition of liability. A defendant landowner may be liable for harm to children on his or her property if the plaintiff shows that (1) the landowner knew or should have known that young children habitually frequent the property; (2) a dangerous condition was present on the property; (3) the dangerous condition was one that was likely to cause injury to children because of their inability to appreciate the risk involved; and (4) the burden of remedying the condition was slight compared to the risk to the children. *Kahn*, 5 Ill. 2d at 625; see also *Corcoran v. Village of Libertyville* (1978), 73 Ill. 2d 316, 326; *Guenther v. G. Grant Dickson & Sons, Inc.* (1988), 170 Ill. App. 3d 538, 541; *Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 939.

■ ■ To ascertain whether a duty exists, the threshold determination in any application of the *Kahn* test is whether the plaintiff has established the existence of a dangerous condition on the property. (*Guenther*, 170 Ill. App. 3d at 541; *Fuller*, 117 Ill. App. 3d at 939.) For purposes of this test, a dangerous condition is one which is likely to cause injury to children, who, by reason of their immaturity, might be incapable of appreciating the risk involved. (*Guenther*, 170 Ill. App. 3d at 541; *Fuller*, 117 Ill. App. 3d at 939.) If the condition involves an obvious risk which children would generally be expected to appreciate and avoid, the landowner is under no duty to remedy the condition.

(*Guenther*, 170 Ill. App. 3d at 541.) Ordinarily, the dangers of fire, water, or falling from a height may reasonably be expected to be fully understood and appreciated by any child of an age to be allowed at large. (*Cope v. Doe* (1984), 102 Ill. 2d 278, 286-87.) Since children are expected to avoid dangers which are obvious, there is no reasonably foreseeable risk of harm. *Cope*, 102 Ill. 2d at 286; *Sampson v. Zimmerman* (1986), 151 Ill. App. 3d 396, 400.

Plaintiffs contend that the body of water on defendants' property was not an obvious danger because it was hidden by the prairie grass and the bordering edge suddenly dropped off into the water. Plaintiffs contend that these additional factors created a special risk that children would not be able to avoid the danger. In support, plaintiffs cite to *Scarano v. Town of Ela* (1988), 166 Ill. App. 3d 184, and *Pasierb v. Hanover Park Park District* (1981), 103 Ill. App. 3d 806.

In *Scarano*, a minor child was injured when he fell from a slide located on the defendant's property. The complaint alleged that the slide was dangerous in that it had worn smooth, slippery, and loose handrails. Plaintiff alleged that he unsuccessfully attempted to prevent his fall by grabbing the defective handrails. (*Scarano*, 166 Ill. App. 3d at 188-89.) The trial court granted defendant's motion to dismiss, and the appellate court reversed, holding that, while a slide may not ordinarily be a dangerous condition, it becomes dangerous when it has defects in its condition that are likely to injure children generally who, because of their age and immaturity, would not be expected to comprehend and avoid the attendant risks. (*Scarano*, 166 Ill. App. 3d at 189.) In such situations, the risk is no longer obvious. The court held that a slide which has defective handrails becomes a greater risk than that which children are normally exposed to and can be expected to appreciate when they use a slide and, as such, children cannot be expected to comprehend and avoid the increased risk. *Scarano*, 166 Ill. App. 3d at 190.

We do not find that the risk at bar was similarly hidden. The prairie grass, which was arguably anywhere from 18 inches to three feet high, was clearly visible. A child old enough to be at large was likely to see the water either through the grass or over it. In addition, the neighbors to the west of defendants had mowed their prairie grass, thus making the water clearly visible on their land. It could be assumed that generally a child would appreciate the fact that the creek would continue through defendants' yard even if it was not readily visible. (See *Weber v. Village of Carol Stream* (1984), 129 Ill. App. 3d 628, 632 (court assumed that the appreciation of the hazards associated with water also apply to the frozen form of water, ice).)

Further, the fact that the bordering edge of the water may have suddenly dropped off three or four feet does not make the water dangerous as that type of a drop-off is common in creeks and the risks are obvious. See *Corcoran*, 73 Ill. 2d at 328; *Wingate v. Camelot Swim Club, Inc.* (1990), 193 Ill. App. 3d 963, 966.

The fact that the creek was at least partially visible differentiates this case from *Pasierb v. Hanover Park Park District.* In *Pasierb*, a seven-year-old child drowned in a park creek that was covered by a thin layer of ice upon which snow had accumulated. The snow covered the creek and the ground so as to make it impossible to discern the location of the creek. The appellate court reversed the trial court's dismissal of the complaint, finding that the risks involved in a completely concealed creek in a park are not the type which children generally would be expected to recognize and appreciate. (*Pasierb*, 103 Ill. App. 3d at 809.) The unsuspecting child in *Pasierb* could not avoid the ditch because it could not be seen. The court noted that the defendant need not make the creek "boy-proof"; rather, its duty was merely to make the existence and location of the creek known. *Pasierb*, 103 Ill. App. 3d at 810.

Here, the existence and location of the creek were known by Elizabeth and John Stevens. Plaintiffs argue, however, that the danger of drowning on defendants' property was hidden from Michelle and that she could not be expected to avoid the danger. Therefore, according to plaintiffs, the Rileys had a duty to remedy that condition.

■■ We agree with plaintiffs that Michelle, at 17½ months old, may not be expected to avoid the danger of drowning; however, a child old enough to be out and about unattended could be expected to avoid it even here, where the water was partially obscured by weeds. Plaintiffs contend that defendants knew that children of very tender age were likely to roam unattended onto the premises and, therefore, they had a duty to protect such children, not just children in general. (*Corcoran*, 73 Ill. 2d at 327.) The evidence does not support plaintiffs' contention, however, as all parties testified that outside of the day-care operation, children did not "roam unattended onto the premises." Further, Elizabeth's testimony that, at times during day-care hours, children were outside without an adult does not support plaintiffs' claim that they were "unattended" as Elizabeth readily admitted that the children were easily within view from inside the house and she did not see anything wrong with this practice. See *Keller v. Mols* (1984), 129 Ill. App. 3d 208, 212 (court will not impose duty to warn of dangers which were not regarded as such by parents).

Our supreme court has observed:

"It is always unfortunate when a child gets injured while playing, but a person who is merely in possession and control of the property cannot be required to indemnify against every possibility of injury thereon. The responsibility for a child's safety lies primarily with its parents, whose duty it is to see that his behavior does not involve danger to himself." *Driscoll v. Rasmussen Corp.* (1966), 35 Ill. 2d 74, 79.

In *Salinas v. Chicago Park District* (1989), 189 Ill. App. 3d 55, the appellate court affirmed the grant of summary judgment in favor of the defendant, holding that defendant did not have a duty to protect an eight-year-old mentally handicapped plaintiff from falling off a slide as the risk of falling off a slide was obvious and "if a child is too young, chronologically or mentally to be 'at large,' the duty to supervise that child as to obvious risks lies primarily with the accompanying parent." *Salinas*, 189 Ill. App. 3d at 62.

■ We note that the mere allegation that a child was accompanied by his parents may not, by itself, relieve the landowner of his duty toward the child. (*Strode v. Becker* (1990), 206 Ill. App. 3d 398, 405-06.) In *Strode*, a 2½-year-old child was injured when his fingers were caught in the rotating spokes of an "exercycle." The complaint alleged that the child and his family were at the defendant's home at the time the injury occurred. The trial court dismissed the complaint, and the appellate court reversed. The appellate court noted that small unsupervised children can suffer numerous foreseeable injuries from such appliances as lamps that can be pulled from tables and electrical sockets which can be penetrated with slender metal objects. (*Strode*, 206 Ill. App. 3d at 405.) While the primary responsibility for injury to very young children must be placed on the parents of the children, owners and occupiers of land are not absolved of all duty to very young children simply because of the parents' responsibility. (*Strode*, 206 Ill. App. 3d at 405.) Landowners will be absolved, however, where it is shown that the child was injured as a result of an obvious danger while being supervised by his parents (see *Kay v. Ludwick* (1967), 87 Ill. App. 2d 114, 118-20 (landowner operating a mowing machine had no duty to discontinue use of the machine while a small child accompanied by the child's mother was playing in the yard)) or when the parents knew of the existence of the dangerous condition that caused the child's injury. See *Trotter v. Chicago Housing Authority* (1987), 163 Ill. App. 3d 398, 401-02 (landlord had no duty to protect a very young child from an uninsulated steam pipe, which was near the child's bed, when the mother was well aware of the condition of the pipe).

In *Strode*, the court stated, "[i]f, at subsequent proceedings, the evidence develops that a parent were with the child while it was playing near the exercycle or *knew* of the existence and condition of the exercycle, the holdings in *Kay* and *Trotter* should then be considered." (Emphasis added.) (*Strode*, 206 Ill. App. 3d at 406.) Because Michelle's parents were admittedly aware of the existence of the water, an obvious danger, and the weeds, which partially obscured the water, defendants were relieved of their duty to protect Michelle.

Plaintiffs argue that, despite a plaintiff's knowledge of an obvious danger, owners and possessors of land may be held liable for injuries resulting from such dangers. Plaintiffs rely on *Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, where the supreme court held that the " 'obviousness' of a condition or the fact that the injured party may have been in some sense 'aware' of it may not always serve as adequate warning of the condition and of the consequences of encountering it." (*Ward*, 136 Ill. 2d at 148-49.) The injured party in *Ward* was a customer who had walked into a concrete post located a few feet outside the exit door of a K mart store. The customer admitted that he had seen the post when entering the store, but testified that as he left the store his view of the post was blocked by the large mirror that he had purchased and was carrying out. The court found that, even though some conditions may be "known" or "obvious," a defendant's duty may extend to such situations where the defendant can anticipate that a plaintiff may, whether from distraction or forgetfulness, fail to avoid the risk posed. (*Ward*, 136 Ill. 2d at 156.) The court held that there was ample evidence to support a finding that the defendant store should have anticipated the risk that a customer carrying a large, bulky item would collide with the post upon exiting through the customer door. *Ward*, 136 Ill. 2d at 157.

While finding that a duty existed in *Ward*, the supreme court noted that a defendant need not anticipate the negligence of others. (*Ward*, 136 Ill. 2d at 152.) The court stated that the relevant inquiry is "whether the defendant should reasonably anticipate injury to those entrants on his premises who are generally exercising reasonable care for their own safety, but who may reasonably be expected to be distracted, as when carrying large bundles, or forgetful of the condition after having momentarily encountered it." *Ward*, 136 Ill. 2d at 152.

We do not find that plaintiffs in the case at bar were "generally exercising reasonable care" for the safety of their daughter. Requiring defendants to anticipate the injury to Michelle would be requiring them to anticipate the negligence of her parents. One could not foresee that the Stevenses would forget about the existence and location

of the water, which they had known about for several years, nor could one foresee that they would be "reasonably" distracted. The fact that Michelle was near the creek, was unattended by her parent, and nearly drowned as the result of her fall into the water will impose no duty on defendants which they otherwise did not have. *Spencer v. City of Chicago* (1989), 192 Ill. App. 3d 150, 157.

We find that no duty on the part of defendants existed, and summary judgment was properly granted. (*Wingate*, 193 Ill. App. 3d at 966.) While the trial court's basis for granting summary judgment was apparently different than ours, we, as a reviewing court, may sustain the trial court's judgment on the basis of any ground warranted by the record even if the trial court did not rely upon that ground. (*Halper v. Vayo* (1991), 210 Ill. App. 3d 81, 90.) Because we find no duty on the part of defendants, we need not address the remaining arguments raised by the parties on appeal.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

WOODWARD and GEIGER, JJ., concur.