[Cite as *Walker v. Hartford on the Lakes, L.L.C.*, 2016-Ohio-7792.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Tatiana Walker, Administratrix of the Estate of Elijah Walker, | : | No. 16AP-271 |
| | : | (C.P.C. No. 13CV-13398) |
| Plaintiff-Appellant, | | and |
| | : | No. 16AP-272 |
| v. | | (C.P.C. No. 15CV-9237) |
| | : | |
| Hartford on the Lake, L.L.C., | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on November 17, 2016

**On brief:** *Jacqueline S. Downey* and *Paul W. Flowers*, for appellant. **Argued:** *Paul W. Flowers*.

**On brief:** *Pickrel Schaeffer & Ebeling Co.,* and *Michael W. Sandner*, for appellee. **Argued:** *Michael W. Sandner*.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Plaintiff-appellant, Tatiana Walker, Administratrix of the Estate of Elijah Walker ("Walker"), appeals a decision of the Franklin County Court of Common Pleas issued on March 8, 2016 rendering a defense verdict following a bench trial. We affirm because we agree that Walker failed to show any breach of duty that proximately caused the drowning of her minor son, Elijah Walker, as a result of his falling through ice covering a water retention pond owned by defendant-appellee, Hartford on the Lake, LLC ("Hartford").

## I.  PROCEDURAL POSTURE[1]

{¶ 2}   On December 13, 2013, Walker filed a complaint in the Franklin County Court of Common Pleas as Administratrix of the estate of her deceased son, Elijah Walker, as parent and next friend of two of her other minor children, Khonyea and Tyion, and on her own behalf, individually.  The Complaint alleged that her five-year-old son, Elijah, drowned in a pond (which was a storm water retention basin) on Hartford's property and sought damages in six separately-delineated counts: two counts of "wrongful death" (one based in negligence and one based in premises liability), a survivorship count, a count for negligent infliction of emotional distress on behalf of Walker, Khonyea, and Tyion (who all witnessed the drowning), a loss of consortium claim, and also a request for punitive damages set forth as a separate count.  (Dec. 13, 2013 Compl. at 7-8.)  On the same day, but under a separate case number, the administrator of the estate of James Russell Jenkins (an adult who drowned while attempting to rescue Elijah) also filed suit.  (Dec. 13, 2013 Compl. in No. 13CV-13422.)

{¶ 3}   Hartford filed an answer and a counterclaim on January 13, 2014.  The counterclaim sought indemnification or contribution from Tatiana Walker in her personal capacity in the event that Hartford were to be found liable in connection with the Jenkins' death based on the allegation that Walker had been negligent in supervising Elijah. (Countercl. in passim.)   In the case brought by Jenkins' estate, Hartford filed a substantively similar third-party complaint against Walker for indemnification or contribution.  (Jan 14, 2014 Third-Party Compl. in No. 13CV-13422.)  On April 1, 2014, the trial court consolidated the two related actions: Walker's action in case No. 13CV-13398 and Jenkins' estate's action in case No. 13CV-13422.

{¶ 4}   On April 21, 2015, with summary judgment motions pending, Walker, both individually, and on behalf of the estate, dismissed the claims against Hartford "without prejudice."  The counterclaim and third-party claim against her survived the dismissal. The trial court held a subsequent oral hearing on May 6, 2015, denied summary judgment to Hartford, and granted a motion to declare that Hartford's claims were still pending

---

[1] This case has a lengthy and convoluted procedural posture which we shall discuss only insofar as it is relevant to the assignments of error in the case.

against Walker in her personal capacity. (Aug. 20, 2015 Decision at 1-2; May 6, 2015 Tr. at 3-12.)

{¶ 5} The trial court issued a revised scheduling order setting trial for February 8, 2016. (Aug. 26, 2015 Scheduling Order.) On October 15, 2015, Walker refiled her complaint naming both Hartford and an insurance company, Western World Insurance Group ("Western") as defendants. (Oct. 15, 2015 Compl. in No. 15CV-9237.) Walker's refiled complaint also listed a different party plaintiff. Rather than suing as an individual and on behalf of her surviving children, the refiled complaint listed Walker solely as "Administrator for the Estate of Elijah Walker" in the caption, the preamble, and in the designation of parties. *Id.* at 1, 3. In each place where the previous complaint had referenced Walker as a party suing "individually, and as Executrix of the Estate" of Elijah Walker, the new complaint simply referred to her as "Administrator for the Estate." (*Compare* Dec. 13, 2013 Compl. at 1. *with* Oct. 15, 2013 Compl. in No. 15CV-9237 at 1.). The new complaint also included a new count for a declaratory judgment against Western seeking an interpretation of Hartford's insurance policy as to the limits of liability based on the notion that the drownings of Elijah and Jenkins were two separate occurrences as contemplated in the policy held by Hartford and issued by Western. (Oct. 15, 2013 Compl. in No. 15CV-9237 at 11-12.)

{¶ 6} On December 7, 2015, the trial court consolidated the refiled case with what remained (after she dismissed her first complaint) of the two original, consolidated cases. The following day, the trial court granted a motion to dismiss Western as a defendant, finding that an action to declare coverage was premature. (Dec. 8, 2015 Order Granting Dismissal.) By agreement of the parties, the trial court ordered the parties in the newly consolidated cases to abide by its August 26, 2015 scheduling order setting trial for February 8, 2016. (Dec. 10, 2015 Scheduling Order.)

{¶ 7} Slightly more than two weeks before the scheduled trial date, on January 22, 2016, Hartford moved for judgment on the pleadings as to all claims except the wrongful death claims. Hartford argued that the claims had to be dismissed because only Elijah's estate was a party to the action under the new complaint, and survivorship, loss of consortium, and negligent infliction of emotional distress claims arguably could not be maintained by an estate, but needed to be maintained by an individual. *Id.*

Hartford also argued that punitive damages could not be recovered in connection with a wrongful death claim. (Jan. 26, 2016 Mot. for Jgmt. on Pleadings.)  Given that trial was set for February 8, the trial court set a pretrial hearing date of February 1, 2016, and informed the parties in writing that they should be prepared to argue motions on that date.  (Jan. 26, 2016 Notice.)

{¶ 8}   The trial court held a hearing on the motion for judgment on the pleadings (and other pretrial motions) on February 1, 2016.  (Feb. 1, 2016 Hearing Tr. at 2-13, filed Mar. 9, 2016.)  After hearing argument on the matter, the trial court determined to grant the motion but allowed for the possibility that subsequent filings by Walker could change the court's mind.  *Id.* at 12.  The day following the hearing, Walker filed a memorandum opposing judgment on the pleadings and a request to correct the case caption.  (Feb. 2, 2016 Memo in Opp. to Jgmt. on the Pleadings; Feb. 2, 2016 Mot. to Recons. & Correct Case Caption.)  On February 3, the trial court filed an entry memorializing its decision to grant judgment on the pleadings.  The following day, Walker filed a motion to amend the complaint and an amended complaint.  Hartford responded the same day with a memorandum opposing amendment based on the late date of the requested amendment in light of the February 8, 2016 trial date.  (Feb. 4, 2016 Memo in Opp. to Mot. to Amend.)

{¶ 9}   On February 8, 2016 prior to trial, the court held another hearing on pending motions.  It noted that the parties were aware the trial was not going to be continued again and had filed motions with little time remaining before trial.  (Feb. 8, 2016 Tr. at 3.)  The court noted that it had informed the parties on January 26 that they should be prepared to argue motions pre-trial since there might be insufficient time to permit full briefing periods as contemplated in the local rules.  *Id.*  It also noted that Walker had previously dismissed the case one month before trial and that the matter had "an extensive history that [was] fraught with unnecessary, costly delays caused by plaintiff's actions."  *Id.* at 10.  Finding that plaintiff's arguments for leave to amend were falsehoods, insincere, unjust, and not made in good faith, the trial court declined to permit the amendment.  *Id.* at 10-12.

{¶ 10} Later that day, a bench trial began on the wrongful death claims brought by the Estate of Elijah Walker.[2]

## II. FACTS

{¶ 11} At trial, nine witnesses testified: Walker, two neighbors who witnessed the drownings (one of whom was Jenkins' girlfriend), three first responders who were at the drowning scene attempting to rescue Elijah and Jenkins, the owner of Hartford during the time of the drowning, the property manager of Hartford, and a record custodian with Franklin County Children's Services (who was merely called to authenticate some Children's Services reports concerning Walker's supervision of her children). The trial court also accepted and read a perpetuation of testimony deposition for an engineering expert hired by Hartford. For clarity and brevity, we discuss the relevant testimony of each witness (except authentication testimony of the record custodian) not necessarily in the order in which the witnesses testified.

{¶ 12} Tatiana Walker testified that on February 7, 2013, she picked up her children from school, took them grocery shopping, and then arrived home. (Feb. 8, 2016 Tr. Vol. 1 at 75.) Once they were at home, a couple of neighborhood kids knocked on the door and asked if her children could come out and play. *Id.* At the time, Walker had four children, ages eight, seven, five, and one. *Id.* at 72. Elijah was the five-year-old. *Id.* She allowed the three boys, ages eight, seven, and five to go outside to play while she began to prepare dinner. *Id.* at 75-76. Before she let the boys go outside she told them not to go in anyone's house, to stay away from cars, and to stay away from the water. *Id.* at 73. She directly admitted that although the pond was iced over, it was not concealed, she knew it was there, and specifically warned her children about it. *Id.* at 85-86. In the time they had lived at the complex (just since the first of December 2012) she had never seen or heard about her kids playing near the water. *Id.* at 70, 80, 99-100. However, she never noted any safety equipment around the pond and nothing indicated the depth of the pond. *Id.* at 82, 84.

---

[2] On January 28, the other plaintiff, Jenkins' estate, dismissed its action. (Jan. 28, 2016 Dismissal at 1.) (The dismissal is captioned "voluntary" and cites Ohio Rule of Civil Procedure 41(A)(1)(a) and Loc.R. 22 of the Franklin County Court of Common Pleas, General Division. But it also states that the dismissal is "with prejudice.")

{¶ 13} After what Walker estimated to be 10 to 15 minutes, her oldest child came to the door panicked. *Id.* at 76-77. She testified that she went to see what the matter was and saw that Elijah had broken through the ice in the middle of the frozen pond and a crowd of people were grouped around its edge trying to help rescue him. *Id.* By that point, Jenkins had already gone into the very cold water in an attempt to save Elijah. *Id.* at 78. Walker testified that she did not know how Elijah had gotten onto the ice or why. *Id.* at 101-03.

{¶ 14} Jenkins' girlfriend, Alana Gamble, who was also a Hartford resident, testified that she and Jenkins were driving into the complex when they saw a commotion and heard screaming. (Feb. 9, 2016 Tr. Vol. 2 at 241, 243-45.) Jenkins stopped the car, got out, and began to crawl across the ice toward Elijah. *Id.* He broke through but held up Elijah for as long as he could before he succumbed to the cold and slipped under. *Id.* at 246. Gamble testified that although her daughter fell into the pond once while learning to ride a bike, Gamble never permitted her daughter to play near the pond and never saw any children playing unsupervised near the pond. *Id.* at 250-51, 254.

{¶ 15} Two officers from the Columbus Division of Police testified that they were dispatched to the pond that day sometime after 5:00 p.m. and arrived within two or three minutes. *Id.* at 188-90, 214-15. When they arrived they were told an adult was in the pond but had already gone under. *Id.* at 192-93, 215-16. One officer testified that there were no rescue materials on site but that he observed people attempting rescue with an extension cord tied to a shovel and other makeshift materials. *Id.* at 198. This same officer also testified that the pond was visible and that it was obvious where the shoreline was. *Id.* at 204-05. The officer testified that there is no requirement that retention ponds be equipped with rescue equipment or signs and that ultimately the police did not cite Hartford for any violation. *Id.* at 208. Both officers went into the water in a rescue attempt, but they were unsuccessful because Elijah was so far from the shoreline of the pond. *Id.* at 192-93, 218. They ultimately desisted when the fire department arrived with ladders and other specialized rescue equipment. *Id.*

{¶ 16} A Columbus Division of Fire Chief testified that when he arrived on the scene he saw a child's body floating face-down in the water and a number of police officers in the water attempting to make a human chain. (Feb. 10, 2016 Tr. Vol. 3 at 373-76.) It

was clear, he testified, that the child had walked far out on the ice and had fallen through. *Id.* at 386. He ordered the police officers from the water to avoid the possibility of further loss of life and the fire department attempted to reach the child with a ladder. *Id.* at 376, 381-82. When that failed, the chief tied a rope around himself and attempted to crawl out to where Elijah was. *Id.* at 381-82, 390. The ice was thin, however, and kept breaking. *Id.* at 390. So instead he swam, breaking the ice as he went. *Id.* But before he could reach him, Elijah sank. *Id.* at 381-82. The fire chief dove under, feeling for him, but could not find him. *Id.* Rescue divers later recovered the bodies of Elijah and Jenkins in 23 feet of water. *Id.* at 388-89.

{¶ 17} The fire chief testified that he could clearly see the boundaries of the pond. *Id.* at 377-78. He saw no rescue equipment around the pond, but he noted that he was unaware of any requirement that such equipment be maintained around a retention pond. *Id.* at 385. He testified that in his view, rescue equipment would not have made a difference unless someone present at the scene had been trained in its use and Elijah had also known how to take advantage of it. *Id.* at 388. He further stated that in his professional opinion, the pond was not, in and of itself, dangerous. *Id.* at 391-92.

{¶ 18} Another resident, Harriet Smith, identified as a leading member of the neighborhood watch and long-time resident of the complex testified that on the day of and perhaps the day before the incident, she had seen some children, possibly Walker's children, playing near the pond. (Feb. 9, 2016 Tr. Vol. 2 at 262-63, 265-66, 272-73.) She told the children not to play by the water and notified the property manager of the complex. *Id.* As a consequence of her discussions with the property manager, the day before the drowning, the management company distributed flyers, which among other things, warned tenants that children should be supervised. *Id.* at 267-69.

{¶ 19} On the day of the incident, Smith's attention was drawn to the emergency in the pond by a friend. *Id.* at 275. She testified that she asked the other boys on the shore to whom the child in trouble belonged, was directed to Walker's apartment, and notified Walker that her child was in the water. *Id.* at 276. She also testified that Walker appeared as if she had just woken up. *Id.* at 277-79. Smith stated that she returned to the pond without Walker but the eldest boy went back to fetch her. *Id.* Smith testified that when

Walker arrived on the scene she was very upset and preoccupied with what her mother would think. *Id.* at 279.

{¶ 20} The property manager and property owner also testified. The property owner testified that he purchased Hartford in August 2010 and sold it in January 2016. (Feb. 8, 2016 Vol. 1 at 45-46.) When he bought the property he had roofing, siding, and interior work done, he demolished a decaying footbridge over the lake, affected various driveway and sidewalk repairs, had the brush and overgrowth around the pond cleared, and installed a fenced-in dog park as well as a second fenced-in playground for recreation. *Id.* at 46. At the time when he purchased the property there was a sign near the office which read:

> Lake rules: No swimming permitted. Coast guard approved rubber boats only. Children under the age of 14 must wear life jackets and be accompanied by an adult.

*Id.* at 56-57. Though the owner testified he was not sure if the sign was there at the time of the incident and that at some point he had requested that it be taken down, the property manager testified that it was still present on February 7, 2013. *Id.* at 57, 339-40. The property owner admitted that he owed a duty to the tenants to provide safe, clean housing but he testified that he believed the pond to be open and obvious to anyone because it was and is a large body of water that can be clearly seen. *Id.* at 61, 64. He said there are no laws or regulations requiring safety equipment, fencing, or warning signs near storm water retention ponds. *Id.* at 149.

{¶ 21} The property manager confirmed that the property owner had made updates to the property including clearing brush around the pond, which had previously obscured the water somewhat. *Id.* at 305-06, 313-14. She testified that the pond was clearly visible, that there was lighting, and that it was not concealed in any way. *Id.* at 314. She testified that no one had ever complained that the pond was hazardous or that they were caught off guard by its presence. *Id.* Both the owner and property manager explained that while sometimes people fish in the pond, they did so without permission, and it is not intended to be a recreational feature. *Id.* at 149-50, 161, 165-66, 340-41.

{¶ 22} The property manager confirmed that in the two days prior to the drowning, she had received complaints that there were children out playing by the water. *Id.* at 321-23. She explained that she attempted to find the children herself and was unsuccessful.

*Id.* at 322-24. The maintenance staff did encounter the children, but the children apparently refused to identify themselves and ran away, with the maintenance workers not being able to figure out who they were. *Id.* at 321-26. Ascertaining who they were was made more difficult by the fact that neither Elijah nor his elder brother were listed on the lease as occupants because Walker had misrepresented the number of children she had in order to avoid the occupancy limit of her apartment. (Feb. 8, 2016 Tr. Vol. 1 at 89-90; Feb. 9, 2016 Tr. Vol. 2 at 317.) According to the property manager's testimony, this incident motivated her to create and distribute the flyers that among other topics reminded residents that children should be supervised when outside. (Feb. 9, 2016 Tr. Vol. 2 at 326.)

{¶ 23} The defense also submitted a perpetuation of testimony deposition for an engineering expert, and the trial court reviewed it as part of the trial proceedings. *Id.* at 234-35; Dec. 18, 2015 Brewer Dep., filed Jan. 5, 2016. The engineer testified that storm water management is intended to control the quantity of runoff and avoid degradation of the environment due to erosion, sediment, and contaminants. (Brewer Dep. at 11.) An integral part of such systems are retention basins or wet ponds. *Id.* at 12. These collect run-off and allow sediments and contaminants like heavy metals which may be suspended in the water to settle out of suspension. *Id.* Because of that function, pools have a base elevation, are essentially funnel shaped (in cross-section), are designed to continually contain water, and must be deep. *Id.* at 13, 22-24. A pond with a 10-foot shelf and a 20-foot depth is typical for many areas. *Id.* at 24. Although the engineer acknowledged that vegetation can make it less desirable to enter ponds, it is generally recommended that banks be kept clear of vegetation to avoid sediment build-up and to aid algae control. *Id.* at 28, 36. He also explained that although aesthetic benefits may accrue from a pond, such features are not intended to be recreational and most such ponds do not have warning signs. *Id.* at 34, 41. He concluded that Hartford's retention pond was sufficient for its purpose and consistent with engineering standards prevailing at the time it was constructed in the 1970s. *Id.* at 30-31, 33-34. He finally testified that modern regulations for such features are not retroactive. *Id.* at 33.

{¶ 24} Both litigants submitted post-trial briefs on February 16, 2016. Then, on March 8, 2016, the trial court issued its written decision. The trial court found that

Hartford owed Elijah a duty of ordinary care in general with respect to his presence in the complex but that since the pond was open and obvious, Hartford owed to him no duty concerning the pond. *Id.* at 5-10. It found that there was no breach of any duty (even if one had existed) and no proximate causation in that Walker had failed to effectively articulate a theory of what Hartford could have done to avoid the tragic deaths. *Id.* at 10-11.

{¶ 25} Walker now appeals.

## III. ASSIGNMENTS OF ERROR

{¶ 26} Walker assigns three purported errors for review:

> [I.] THE TRIAL JUDGE ERRED, AS A MATTER OF LAW, BY GRANTING A JUDGMENT UPON THE PLEADINGS UPON PLAINTIFF-APPELLANT'S CLAIMS FOR SURVIVORSHIP, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, LOSS OF CONSORTIUM, AND PUNITIVE DAMAGES.
>
> [II.] BECAUSE LAKES, SWIMMING POOLS, AND OTHER BODIES OF WATER DO NOT QUALIFY AS OPEN-AND-OBVIOUS HAZARDS AS A MATTER OF LAW, THE TRIAL COURT ERRED BY ENTERING A DEFENSE VERDICT UPON THE WRONGFUL DEATH CLAIMS.
>
> [III.] THE TRIAL COURT'S JUDGMENT AGAINST PLAINTIFF-APPELLANT IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

We address these assignments of error out of order for purposes of analysis.

## IV. DISCUSSION

### A. Standard of Review

{¶ 27} In reviewing a decision reached at a bench trial we utilize a manifest weight standard. The Supreme Court of Ohio has declared that "[i]n civil cases, as in criminal cases, the sufficiency of the evidence is quantitatively and qualitatively different from the weight of the evidence." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, paragraph two of the syllabus. Sufficiency is:

> "a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of

> adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Id.* at ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *Black's Law Dictionary* 1433 (6th Ed.1990). By contrast:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict * * * . Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594; *see also id.* at ¶ 14-23 (limiting and criticizing the use of the "some competent, credible evidence" standard set forth in *CE. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), as an incorrect merger of the concepts of weight and sufficiency).

{¶ 28} We have recently explained our approach to manifest weight as follows:

> In addressing a manifest weight of the evidence argument, we are able to consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). Accordingly, we afford great deference to the jury's determination of witness credibility. *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55. *See also State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus (credibility determinations are primarily for the trier of fact).

*State v. Sims*, 10th Dist. No. 14AP-1025, 2016-Ohio-4763, ¶ 17.

**B. Second and Third Assignments of Error—Whether the Trial Court Erred in Reaching a Defense Verdict Based on the Relevant Law and Evidence**

{¶ 29} Whether framed as a wrongful death claim under R.C. 2125.01, a surviving claim based on suffering endured by the deceased under R.C. 2305.21, a loss of

consortium claim, a negligent infliction of emotional distress claim, or punitive damages, at the heart of potential liability in this case is the common law of negligence and premises liability. *Thompson v. Wing*, 70 Ohio St.3d 176, 184 (1994) (wrongful death claim is based on the same common law elements of negligence but is a statutory action for wrongful death rather than injury); *Paugh v. Hanks*, 6 Ohio St.3d 72, 80-81 (1983) (setting forth the basis of a negligent infliction claim as a breach of the duty to refrain from negligently inflicting emotional distress with the foreseeable and proximate result of emotional distress); *Lewis v. St. Bernard*, 157 Ohio St. 549 (1952), paragraphs one through three of the syllabus (holding, in regard to a predecessor of R.C. 2305.21, that a survivorship claim is merely a personal injury claim that survives death); *Reid v. Plainsboro Partners, III*, 10th Dist. No. 09AP-442, 2010-Ohio-4373, ¶ 71 (internal quotation and citations omitted) ("it is well-settled that punitive damages is not a separate claim in itself but rather an issue in the overall claim for damages"); *Martinez v. Yoho's Fast Food Equip.*, 10th Dist. No. 02AP-79, 2002-Ohio-6756, ¶ 27 (loss of consortium is a derivative claim); *see also* R.C. 2305.21; R.C. 2125.01.

{¶ 30} In other words, whether or not the trial court was correct to have limited the claims in this case prior to trial, the essence of what Walker was required to prove at trial was the breach of a duty and proximate causation of damage from the breach. *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989) ("To establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty and injury resulting proximately therefrom."). The trial court held that Hartford owed no duty with regard to the pond because the pond was open and obvious, that there was no breach of any duty (even had one existed), and that Walker failed even to cogently articulate a theory of proximate causation. If any one of those holdings was correct then Walker failed to prove her case regardless of the framing of the count, the damages available, or other elements of proof. Thus, if any one of those holdings was correct and Walker failed to prove her case, the question of whether the trial court was correct to limit the claims before trial becomes moot because Walker would be unable to prevail on any of her potential claims. We, therefore, first address negligence and its attendant issues.

### 1. Duty

{¶ 31} Generally, a landlord owes his or her tenants and other persons who are lawfully on the premises a common law duty of care and a statutory duty to "[m]ake all

repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition" and "[k]eep all common areas of the premises in a safe and sanitary condition." R.C. 5321.04(A)(2) and (3); *Mann v. Northgate Investors, L.L.C.*, 138 Ohio St.3d 175, 2014-Ohio-455, ¶ 13, quoting *Shump v. First Continental-Robinwood Assocs.*, 71 Ohio St.3d 414 (1994), syllabus ("A landlord owes the same duties to persons lawfully upon the leased premises as the landlord owes to the tenant."); *see also Mann* at ¶ 10 (explaining that the statutory scheme affords greater rights to tenants than the common-law); *Beaney v. Carlson*, 174 Ohio St. 409, 412 (1963) (discussing the common-law duty or ordinary care). At least with respect to common law duties, "[w]here a danger is open and obvious, a landowner owes no duty of care to individuals lawfully on the premises." *Armstrong v. Best Buy Co.*, 99 Ohio St.3d 79, 2003-Ohio-2573, syllabus.

{¶ 32} No testimony in this case at trial led to any other inference than that the retention pond on Hartford's property was open and obvious. A responding police officer testified that that the pond was visible and it was obvious where the shoreline was. (Feb. 9, 2016 Tr. Vol. 2 at 204-05.) The fire chief testified that he could clearly see the boundaries of the pond. (Feb. 10, 2016 Tr. Vol. 3 at 377-78.) The property owner testified that he believed the pond to be open and obvious to anyone because it is a large body of water that can be clearly seen. (Feb. 8, 2016 Tr. Vol. 1 at 64.) The property manager testified that the pond was clearly visible, that there was lighting, and that it was not concealed in any way. (Feb. 9, 2016 Tr. Vol. 2 at 314.) She testified that no one ever complained that the pond was hazardous or that they were caught off guard by its presence. *Id* at 314. Walker admitted that although the pond was iced over, it was not concealed, she knew it was there, and specifically warned her children about it. (Feb. 8, 2016 Tr. Vol. 1 at 85-86.)

{¶ 33} This Court has previously remarked that " 'generally the danger of drowning in a body of water is considered an open and obvious risk which both minors and adults should be expected to be able to appreciate and avoid.' " *Mullens v. Binsky*, 130 Ohio App.3d 64, 71 (10th Dist.1998), quoting *Torf v. Commonwealth Edison*, 644 N.E.2d 467, 469 (Ill.Ct.App.1994). Nonetheless, three justices of the Supreme Court noted in dissenting from a dismissal for a case improvidently accepted that "Ohio's appellate courts have been reluctant to apply the open-and-obvious doctrine to children of tender

years." *Uddin v. Embassy Suites Hotel*, 113 Ohio St.3d 1249, 2007-Ohio-1791, ¶ 7. However the trial court cited, and this Court has found, cases suggesting that even children of tender years can appreciate the dangers of ponds and bodies of water. *Wingate v. Camelot Swim Club, Inc.*, 550 N.E.2d 665, 667 (Ill.Ct.App.1990) (partially ice-covered duck pond held to be an obvious danger to five-year-old and seven-year-old); *see also, e.g., Cope v. Doe*, 464 N.E.2d 1023, 1028 (Ill.1984) (finding a partially ice-covered retention pond was an open and obvious danger to a seven-year-old); *Washabaugh v. N. Virginia Constr. Co.*, 48 S.E.2d 276, 279 (Va.1948) (holding that a quarry swimming hole was an open and obvious danger to a nine-year-old); *Weber v. Village of Carol Stream*, 472 N.E.2d 1203, 1206-07 (Ill.Ct.App.1984) (completely frozen retention pond held to be an obvious danger to nine-year-old); *compare Fields v. Henrich*, 208 S.W.3d 353, 361 (Ct.App.Mo.2006) (holding that an aeration pond was not an open and obvious danger to a two-year-old). While there was room for disagreement given Elijah's youth, we do not find error in the conclusion that the ice-covered pond would have been an open and obvious danger to him, particularly given that Elijah was expressly warned of the danger by his mother. However, even were we to assume, arguendo, that the ice-covered pond was not obvious to Elijah, Walker's claims would still fall short because they do not demonstrate a breach of duty or proximate causation.

### 2. Breach of Duty

{¶ 34} At trial, the testimony by the only engineering expert to testify in the case was that the pond was typical of storm water retention ponds in many areas, that it was deep out of necessity, and that clearing vegetation around it was appropriate maintenance given that its proper function was as a retention pond, not a recreation feature. (Brewer Dep. at 11-13, 22-24, 28, 34, 36, 41.) The engineer concluded that Hartford's retention pond was sufficient for its purpose and consistent with engineering standards prevailing at the time it was constructed in the 1970s and stated that modern regulations of such storm water features are not retroactive. *Id.* at 30-31, 33-34. A police officer, the fire chief, and the property owner all also testified that there are no regulations requiring, for example, warning signs, safety equipment, or fencing around such ponds. (Feb. 8, 2016 Tr. Vol. 1 at 149-50; Tr. Vol. 2 at 208, 385.) The fire chief also opined that the pond was not dangerous in and of itself and that the cause of Elijah's tragic death was the fact that he chose to walk out to the middle of the ice-covered pond. (Feb. 10, 2016 Vol. 3 at 386.)

{¶ 35} Both the leader of the neighborhood crime watch initiative and the property manager acknowledged that Hartford became aware of the fact that some children (possibly Walker's children) were playing near the pond in the day or days immediately prior to the drowning. (Feb. 9, 2016 Tr. Vol. 2 at 265-66; Tr. Vol. 3 at 272-73, 321-23.) However, the children disregarded the neighborhood watch leader when she told them not to play near the water. *Id.* at 265-69, 272-73. They disregarded the maintenance men who asked them not to play near the water. (Feb. 9, 2016 Tr. Vol. 2 at 321-26.) And the property manager could not discern, through her own observations or the observations of the maintenance staff, to whom the children belonged. *Id.* at 322-24. Nevertheless, Hartford printed and distributed flyers the day before the drowning expressly warning, among other content in the flyers, that children should be supervised when outside. *Id.* at 326.

{¶ 36} No witness testified that the pond was ill-maintained or unsafe and no witness suggested that Hartford should have done anything different with the pond than what it did. No witness suggested that the pond, which, although it was human made, was apparently a necessary element of a storm water retention system, should not have been created, or should have been removed. Thus, it is not clear what duty Hartford owed to either Elijah or Walker that it even arguably breached.

### 3. Proximate Cause

{¶ 37} "If an injury is the natural and probable consequence of a negligent act and it is such as should have been foreseen in the light of all the attending circumstances, the injury is then the proximate result of the negligence." *Mussivand* at 321. It is a struggle to even see how to apply this classic definition of proximate cause to the facts of this case because this is not a case where someone, failing to note the hazard, accidentally encountered it.

{¶ 38} In this case, Elijah, a five-year-old, walked out onto the frozen pond until a point, near the center, the ice tragically gave way beneath him. (Feb. 8, 2016 Tr. Vol. 1 at 76-77. Elijah was in the middle of the pond; Feb. 9, 2016, Tr. Vol. 2 at 320. (residents reported that Elijah walked out on to the ice and fell through); *Id.* at 194, 205 (police officer explains that Elijah "had obviously walked on the ice to get to the center"); Feb. 10, 2016 Tr. Vol. 3 at 386.) (fire chief testified that the cause of Elijah's drowning was "[h]im walking out on the pond").) A less steep bank, warning signs, paths situated farther away

from the water, or other similar preventive measures (short of a high fence) that Hartford could have taken (despite having no duty to do so) would likely have proved useless to prevent the child's action in walking on the ice, despite his mother's warning, despite the warnings of the neighborhood watch leader and Hartford maintenance staff, and despite what mature common sense would observe. Nothing Hartford did or failed to do proximately caused Elijah's death or the distress and other damages resulting from his tragic death.

{¶ 39} Walker's second and third assignments of error are overruled.

## C. First Assignment of Error—Moot

{¶ 40} Were we to find that the trial court erred in dismissing Walker's claims before trial, the error would have no effect on the claims Walker was prevented from presenting at trial. Because Walker's claims and damages that the trial court dismissed prior to trial required proof of negligence, our determination that the trial court correctly found that Walker could not show a breach of duty by Hartford or proximate causation, makes the first assignment of error moot. Finding it moot, we consider no further Walker's first assignment of error.

## V. CONCLUSION

{¶ 41} Because we agree that Walker failed to prove the breach of any duty or proximate causation of the injury from the breach, we overrule Walker's second and third assignments of error. Since all of Walker's claims, even those dismissed prior to trial require proof on those elements, we need not and do not consider whether dismissal of some of her claims prior to trial was proper. Thus her first assignment of error is moot. We, therefore, affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER and LUPER SCHUSTER, JJ., concur.